William S. WALTERS, Jr., Plaintiff–Appellant,

v.

FIRST TENNESSEE BANK, N.A. MEMPHIS, et al., Defendants–Appellees.

Nos. 86–6031 to 86–6033.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 8, 1987.

Decided Aug. 16, 1988.

Rehearing Denied Oct. 14, 1988.

---

268

Larry E. Parrish, Parrish & Shaw, Hal Gerber (argued), Gerber, Gerber and Agee, Memphis, Tenn., Lewie R. Polk, III, for plaintiff-appellant.

Leo Bearman (argued), Robert Mark Glover, Frank Glankler, Memphis, Tenn., for defendants-appellees.

Before NELSON and NORRIS, Circuit Judges, and PECK, Senior Circuit Judge.

JOHN W. PECK, Senior Circuit Judge.

This is an appeal from actions brought by appellant William Walters, Jr., individually and for himself and the other shareholder of Ten Tex Marine, Inc. ("Ten Tex") against appellee First Tennessee Bank ("the Bank") in connection with loans extended by the Bank to Walters personally and to Ten Tex, in which Walters was a 50% shareholder. The actions alleged usury, breach of contract, and fraudulent conduct in violation of federal racketeering (RICO) statutes. After various pre-trial orders and a directed verdict, only Walters' usury claim was considered by the jury. Although the jury found in Walters' favor, the district court entered a judgment notwithstanding the verdict for the Bank. For the reasons stated below, we affirm the judgment of the district court.

## I.

Inasmuch as the factual background of this litigation is lengthy and complex, a

relatively brief summary follows. More specific facts are detailed in the course of the discussion of the individual issues on appeal.

In May 1979 Walters obtained a personal loan for $475,000.00 from the Bank evidenced by a promissory note which provided that the interest would be at a floating rate pegged to 130% of the Bank's prime rate. The loan was secured by a promissory note from Fischer Lime & Cement Co. ("Fischer"), of which Walters was the payee. When Walters later defaulted, the Bank asserted its right under the security agreement to receive payments from Fischer.

In 1979 Walters also negotiated with the Bank for loans to capitalize Ten Tex and to construct a port facility on the Mississippi River in Tennessee. Initially the Bank made several loans to Ten Tex, totalling $1,521,000.00, the principal loan being for $1,341,000.00 and containing interest rate provisions identical to that of Walters' personal loan. Two subsequent loans for $100,000.00 and $80,000.00 were made at 15% and 16% interest respectively. An agreement was also reached between Ten Tex and the Bank to finance the port facility project through the issuance of industrial revenue bonds.

In November 1979 the Industrial Revenue Bond Board of Shelby County, Tennessee issued $1,425,000.00 in bonds. When the bond issue closed in December 1979, Walters executed an industrial revenue bond indenture which transferred all of the assets of Ten Tex to the Industrial Revenue Bond Board. The Bank was appointed trustee to hold Ten Tex assets and to receive payments under a lease by which Ten Tex leased back the port facilities. The Bank purchased all of the bonds.

At the time the bond indenture was signed, the Bank advised Walters that certain pieces of marine equipment could not be financed under the bond issue until preferred ship mortgages could be executed on the equipment. Walters alleges that he was told that the needed documentation could be accomplished in a matter of a few weeks and that the marine equipment could then be financed through the bond issue. In order to complete Ten Tex's capitalization pending the financing of all assets under the bonds, a $376,000.00 note (hereinafter "the side note") was executed by Ten Tex. The note was secured by marine equipment and was subject to the same interest rate provisions as the $1,341,000.00 note. The principal amounts on the $1,341,000.00, $100,000.00 loan, and $80,000.00 loan were retired with proceeds from the bond issue. The proceeds of the sale of certain items of marine equipment upon which preferred ship mortgages had been executed were applied to interest remaining on those loans.

In September 1980 Ten Tex was unable to make its lease payment of $152,166.66. The Bank terminated the lease and, as trustee, declared its intent to repossess the premises. The Bank also accelerated payment on the side note and Ten Tex declared bankruptcy. Ten Tex has alleged that on September 15, 1980, the Bank, as trustee, held more than $185,000.00 in bond issue funds which it could release, but did not release, to Ten Tex, a factor that heavily contributed to its bankruptcy.

In May 1982 Walters filed an action on his own behalf against the Bank under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.*, and under the National Bank Act, 12 U.S.C. §§ 85, 86. He also alleged pendent state claims for misrepresentation, breach of contract, and common law fraud. The gravamen of the complaint was that the Bank committed "prime rate fraud" by charging excessive and usurious interest on the $475,000.00 loan. In November 1982 Walters also filed a shareholder derivative action on his own behalf and that of Ten Tex's other 50% shareholder. This action raised essentially the same claims with regard to the $1,341,000.00 loan, side note, and bond issue. An interpleader action was filed by Fischer in October 1982 in an effort to protect itself from multiple liability due to conflicting demands for payment by Walters and the Bank. Fischer's note payments were thereafter paid into the registry of the court.

In August 1984 the district court consolidated the three actions for trial. On September 20, 1984, the district court granted summary judgment in favor of the Bank on certain issues. The court ruled that the interest due on the $1,341,000.00 loan was paid on November 2, 1979, and thus any usury claim on that loan was barred by the two year statute of limitations set forth in 12 U.S.C. § 86. The bond issue was alleged to have been "tainted" because Walters claimed that Ten Tex paid not only the 9% bond rate of interest but also the underlying 15% and 16% interest on two of the notes during the period from November 1 to December 5, 1979; however, the court ruled that the undisputed affidavit of the trust officer of the Bank indicated that the 9% interest due on the bond issue was paid by the Bank, and thus no double interest was paid by Ten Tex. As for the claims concerning the $346,000.00 side note, the district court ruled that the statute of limitations had not run. The court determined, however, that that note was subject to a preferred ship mortgage; under the Preferred Ship Mortgage Act, such a mortgage "may bear such rate of interest as is agreed by the parties thereto." 46 U.S.C. App. § 926. The court ruled that the Preferred Ship Mortgage Act superceded the National Bank Act because

> [Section] 926 was intended to be the exclusive word on loans subject to preferred ship mortgages. The policy behind the P.S.M.A. was to encourage investment by lending concerns in a unique commercial area fraught with risk. A contrary holding, as urged by plaintiff, would contravene congressional policy and make lenders susceptible to a double interest penalty heretofore thought inapplicable.

The court also reasoned that in any event there could be no substantive usury violation of 12 U.S.C. § 86 because the essential element of intent was missing.

At jury trial in September 1985, the district court granted a directed verdict for the Bank on the RICO and fraud claims alleged in both lawsuits. The only remaining issue presented to the jury was whether the Bank knowingly charged Walters usurious interest on the $475,000.00 note. As noted above, the jury found in Walters' favor, but the district court entered judgment NOV for the Bank. The district court's decision was based on its finding that Walters failed to prove that the excess interest charge was knowingly assessed. The only testimony on the issue was from the Bank's witness, Charles Dudley, who admitted two periods of overcharges, but who testified that they (as well as certain undercharges) were inadvertent errors due to manual computer programming oversights. Walters presented no contradictory evidence tending to show that the overcharges were anything but the result of negligence.

Walters, on behalf of himself and as a shareholder of Ten Tex, timely appealed. Walters has raised numerous issues on appeal, which we will address *seriatim*.

## II.

### *The Summary Judgment Order*

 Walters argues that the district court erred in dismissing the usury claim filed on behalf of Ten Tex in the derivative action. He urges that, contrary to the district court's conclusion, the usury claim on the $1,341,000.00 note was not barred by the two-year statute of limitations in 12 U.S.C. § 86 which governs such claims. Walters maintains that Ten Tex's filing of a Chapter 11 petition on September 30, 1980, triggered the automatic stay provision of 11 U.S.C. § 362 [1] before the statute of limitations had run. He theorizes that since Ten Tex, the debtor, was a named party defendant in the derivative action, the automatic stay provision would have prohibited initiation of the derivative action until disposition of the bankruptcy case, which had not occurred as of November 1982. We reject Walters' contention.

---

1. 11 U.S.C. § 362(a)(1) establishes an automatic stay against the "commencement ... of other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title." The stay continues until the earliest of the time the case is closed, is dismissed, or discharge is granted or denied. 11 U.S.C. § 362(c)(2).

First, Walters did not raise this point before the district court. It is well established that where a plaintiff fails to assert in district court that the statute of limitations has been tolled, he cannot raise it for the first time on appeal. *Roberts v. Berry*, 541 F.2d 607, 610 (6th Cir.1976). Even if we were to reach the merits of the issue, we would determine that this is not "an action against the debtor" stayed by 11 U.S.C. § 362. As noted by the Bank, Ten Tex is merely a nominal defendant in the derivative action; the Bank is the party charged with usury. This is sufficient to take the derivative action out of the scope of the automatic stay provision. *See, e.g., Price & Pierce Int'l, Inc. v. Spicers Int'l Paper Sales, Inc.*, 50 B.R. 25 (S.D.N.Y. 1985) (interpleader action, which named bankrupt debtor as defendant, was not subject to automatic stay, because the bankrupt was only a nominal defendant). *See also NLT Computer Services Corp. v. Capital Computer Systems, Inc.*, 31 B.R. 960, 961 (M.D.Tenn.1983), *vacated on other grounds*, 755 F.2d 1253 (6th Cir.1985).

■ Walters also challenges the district court's ruling that the usury provisions of 12 U.S.C. § 85 and § 86 were not applicable to Ten Tex's side note. The district court determined that because the side note was secured by a preferred ship mortgage, the Preferred Ship Mortgage Act, 46 U.S.C. App. § 911 *et seq.*, not the National Bank Act, controlled. Because 46 U.S.C.App. § 926(d) provides that "a preferred mortgage may bear such rate of interest as is agreed by the parties thereto," the district court reasoned that the parties could agree to any rate of interest, even one which exceeded the limits of 12 U.S.C. § 85.

Walters argues that the district court erred in making this determination. He observes that the side note provided for "[a] floating rate which is equal to 130% of the Bank's prime rate and changes the same day that the Bank's prime rate changes, but such floating rate shall in no event exceed the maximum rate allowed by

applicable law." Moreover, he stresses that preferred ship mortgages were not recorded on two vessels securing the note until several weeks or months after the loan was made and after the charging and receipt of interest occurred. Thus, Walters raises questions of significance in this regard. First, can the side note constitute a preferred ship mortgage and gain the protection of the Preferred Ship Mortgage Act, which has strict execution and recording requirements for preferred mortgage status, *see* 46 U.S.C.App. §§ 921, 922, when the preferred ship mortgages were not executed and recorded on vessels partially securing the side note until long after the note's execution? Second, even if the side note were controlled by the Preferred Ship Mortgage Act, does the note's above interest rate provision evidence an intent of the parties to be bound by applicable federal and/or state usury laws which can be incorporated by reference into preferred ship mortgages? *See C.I.T. Corp. v. M/V Miss Eileen*, 447 F.2d 761, 763 (5th Cir.1971). However, we need not reach these legal issues, which the district court apparently did not consider,[2] in light of our determination that the district court's alternative ground for dismissal was correct. The district court found with regard to both the side note and the $1,341,000.00 loan that there could be no possible substantive violation of 12 U.S.C. § 86 because Walters failed to show any evidence of intent, a requisite element of usury.

Section 86 provides a penalty for "[t]he taking, receiving, reserving, or charging a rate of interest greater than is allowed by the preceding section [12 U.S.C. § 85] *when knowingly done....*" (emphasis added). The Ninth Circuit has held that the standard for determining intent under § 86 is that (1) the act of charging excess interest is intentional, and that (2) the bank knew its policy would result in receipt of more than the legal rate. *American Timber & Trading Co. v. First Nat'l Bank of Ore-*

---

**2.** We note that Walters did not raise these particular arguments before the district court. He apparently agreed at that time that the Preferred Ship Mortgage Act was applicable to the side

note; he argued that he did not agree to be overcharged interest and, therefore, that § 926 of the Preferred Ship Mortgage Act should not protect the Bank.

*gon,* 690 F.2d 781, 788 (9th Cir.1982). We find this standard helpful. Implicit in this standard is that an honest mistake of fact, e.g., a mistake in computation, is not usurious. *See, e.g., White v. Kaminsky,* 196 Tenn. 180, 185, 264 S.W.2d 813, 815 (1954). *See also* cases collected at 51 A.L.R.2d 1087.

Our review of the record shows that the district court properly found that Walters presented no evidence of intent. The only evidence regarding intent, or lack thereof, was provided by the affidavit of Charles Dudley, submitted to support the Bank's motion for summary judgment. In that affidavit Mr. Dudley thoroughly and concisely explained how the overcharges and undercharges occurred. He stated that at all relevant times the interest rate ceiling applicable to the thousands of notes held by the Bank was set on computer by manual process. Mr. Dudley stated that during the time the Ten Tex notes were in effect, the prime rate and Federal discount rate changed on a weekly basis. As such, the interest rate and usury ceiling rate under 12 U.S.C. § 85, which is pegged to the discount rate were also changing weekly. When the usury ceiling thus changed, the account officer had to report the new ceiling to the Bank's Loan and Discount Division, where a clerk programmed into the computer the new usury ceiling for the particular note. Mr. Dudley averred that approximately 98 such changes occurred during the relevant time period and that only five errors occurred on the Ten Tex notes. Of these five, three were favorable to Ten Tex and resulted in a net undercharge to Ten Tex. Dudley attributed the errors solely to negligence and inadvertence.

In response Walters presented no evidence tending to show that the Bank acted other than negligently or by mistake. As such, there was a complete failure of proof concerning intent, a required element of Walters' usury case. Summary judgment for the Bank was therefore proper. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 327, 106 S.Ct. 2548, 2553, 2555, 91 L.Ed.2d 265 (1986).

We also find unpersuasive Walters' argument that there was evidence of usury due to the Bank's failure to modify its claims against Ten Tex in the bankruptcy proceeding to take into account the overcharges of which it was by then aware. Walters was granted leave to amend his complaint in the derivative action in order to allege that two of the Bank's claims in bankruptcy court were fraudulent because they were based on usurious interest rates, and because the Bank had received payments from the bankruptcy court after receiving knowledge of the usurious nature of the interest. However Walters voluntarily dismissed this new count on the first day of trial; he is therefore estopped from raising it on appeal.

*The Directed Verdict*

■ Walters argues that the district court also erred in directing a verdict for the Bank on the RICO and common law fraud claims, as well as on the breach of contract claims. Central to these claims is the theory that the Bank perpetrated a fraud and breached the loan agreement by charging Walters and Ten Tex an announced published prime rate that was higher than an unannounced lower rate charged to certain other short-term borrowers. Walters argues that "prime rate" as used in the loan agreements and as generally understood means the best, i.e. lowest, rate given by a bank to its customers.

In order to state a valid RICO claim, a plaintiff must prove that the defendant committed an illegal predicate act. *See* 18 U.S.C. § 1962. Walters relied on the federal mail fraud statute, 18 U.S.C. § 1341, in both the individual and derivative actions. As stated by this court in *Bender v. Southland Corp.,* 749 F.2d 1205 (6th Cir.1984):

[t]he crime of mail fraud has two elements: a scheme or artifice to defraud and a mailing for the purpose of executing the scheme. *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *United States v. Talbott,* 590 F.2d 192, 195 (6th Cir.1978); *United States v. Schilling,* 561 F.2d 659, 661 (6th Cir.1977). This court has held that the scheme to defraud must involve:

*[I]ntentional* fraud, consisting in deception *intentionally* practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. *[A scheme to defraud] requires intent to deceive or defraud.* [Emphasis supplied.]

*Epstein v. United States,* 174 F.2d 754, 765 (6th Cir.1949). *See also Schilling,* 561 F.2d at 662. This court has also held that the scheme to defraud must involve "misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Van Dyke,* 605 F.2d 220, 225 (6th Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979).

*Id.* at 1215–16. There was no evidence that the Bank published a false rate. Although there were admittedly lower interest rates charged to some other short-term borrowers, the Bank presented evidence that certain categories of loans are routinely excluded in the industry in determining a bank's prime rate. Walters' own expert, Mr. Auerbach, agreed on cross-examination that numerous categories of loans were properly excluded by the Bank. He also responded to the Bank's questioning as follows:

Q: Let me ask you this question, Mr. Auerbach. If in determining the lowest rate in the bank, which you call the actual prime rate, the bank, this hypothetical bank, takes a look at all of its loans that fit the category of the prime and it excludes from that group all of the loans that are in other categories for whatever reason and it determines on making that calculation that the lowest rate that it charges in the prime rate category that remains after eliminating the exclusions is in fact its announced prime, then it has done nothing in your eyes that's wrong, right?

A: That's correct.

Q: Nobody's been defrauded; nobody has been misrepresented and nobody has been deceived?

A: That's right.

The Bank further presented the testimony of one of its officers that the Bank had conducted a search of all its 90–day loans of $100,000.00 or more to corporate borrowers for commercial purposes, and that, according to its findings, the Bank made no loans below its announced prime rate in categories that Walters and Auerbach believed to be proper in determining the "true" prime rate. Moreover, the Bank also established that of the fourteen loans highlighted by Walters as evidence that the Bank sometimes charged less than the announced prime rate, nearly one-half were required by Tennessee law at that time to have a 10% interest rate ceiling as they were single payment loans of $1,000.00 or less, *see* Tenn.Code Ann. § 47–14–104(a)(1), and/or they fell into the categories that were inappropriate for determining the "prime rate." Finally, there was no evidence that the Bank ever represented that the prime rate would be the lowest rate; rather, Walters, an experienced businessman and member of the board of another national bank, who negotiated his own loan and the Ten Tex loans, proceeded on the basis of his own assumption of what "prime rate" meant.

Given this, the district court properly directed a verdict on the fraud claims. Giving Walters and Ten Tex the benefit of every fair and reasonable inference, there simply was an absence of proof of an intent to defraud, deception, or misrepresentations or omissions reasonably calculated to deceive Walters as required for mail fraud. See *Bender, supra,* 749 F.2d at 1216. As stated by this Court regarding a RICO-mail fraud case decided subsequent to the district court's disposition of this case:

The fact that the parties take different positions under the contract as to the appropriate prime rate, or the fact that the defendant charged too high a "prime rate" and thereby concealed or refused to disclose what the plaintiff considers the true prime rate called for under the contract, does not give rise to a valid claim for fraud.

*Blount Financial Services, Inc. v. Walter E. Heller & Co.,* 819 F.2d 151, 152 (6th Cir.1987). Similarly, the common law

fraud claims also premised on the prime rate fraud theory were properly disposed of by way of the directed verdict. *See Gold v. Nat'l Savings Bank of the City of Albany,* 641 F.2d 430, 435 (6th Cir.), *cert. denied,* 454 U.S. 826, 102 S.Ct. 116, 70 L.Ed.2d 100 (1981) (applying Tennessee law).[3]

In the derivative action Walters also claimed that the Bank committed fraud in three other instances: 1) by extending the duration of the side note so that it could collect higher interest than that provided by the industrial bond issue; 2) by withholding bond issue funds on which Ten Tex had paid interest and thereby contributing to its cash shortage, which led to bankruptcy; and 3) by collecting interest upon interest and assessing penalty charges for late payments. Having carefully reviewed these allegations and the record, we conclude that the district court properly rendered a directed verdict for the Bank with regard to these claims.

> As the Tennessee Supreme Court has noted in *Jones v. Seal,* 56 Tenn.App. 593, 409 S.W.2d 382 (1966), "the facts and circumstances proved [at trial] must clearly establish the inference of fraud." 409 S.W.2d at 385. *See also Anderson v. Nichols,* 39 Tenn.App. 503, 286 S.W.2d 96 (1955). A jury cannot render a verdict on the basis of speculation, surmise or conjecture. *See Dayton Veneer & Lumber Mills v. Cincinnati N.O. & T.P. Railway Co.,* 132 F.2d 222 (6th Cir.1942); *Cecil Corley Motor Co., Inc. v. General Motors Corp.,* 380 F.Supp. 819 (M.D. Tenn.1974), and *Groves v. Witherspoon,* 379 F.Supp. 52 (E.D.Tenn.1974).

*Gold,* 641 F.2d at 435. The evidence presented on these three allegations of fraud would at most have allowed a jury to reach a verdict based on sheer speculation or conjecture.

Walters also alleged that the Bank breached its contract by charging interest on the basis of its announced prime rate rather than its alleged lowest "unannounced" prime rate. The facts and evidence recounted above which permitted the district court to enter a directed verdict on the prime rate fraud theory also supported the directed verdict on the related breach of contract claim. Walters alleged three other state law breach of contract theories, which we believe were also properly the subject of a directed verdict for the Bank.

■ Walters argued that the $475,000 note was too indefinite to be enforceable because it allowed the Bank to charge interest based on a prime rate that it set unilaterally. As a general principle, the law does not favor declaring contracts void for indefiniteness. Williston, *Law of Contracts,* 3 ed., Vol. 1 § 37. Although we could find no Tennessee cases directly addressing the enforceability of monetary obligations bearing a variable form of interest rate, the overwhelming, if not unanimous, weight of authority upholds the validity of such variable rate contracts, provided the lender's power to vary the interest rate is tied to some objective or marketplace factor. As stressed by the Connecticut Supreme Court in *Constitution Bank & Trust Co. v. Robinson,* 179 Conn. 232, 425 A.2d 1268 (1979),

> The essential characteristic that distinguishes enforceable from unenforceable variable interest rates is the extent of discretion retained by the lender. If the lender may arbitrarily adjust the interest rate without any standard whatsoever, with regard to this borrower alone, then the note is too indefinite as to interest. If however the power to vary the interest

---

3. In connection with the prime rate fraud portion of the trial, the district court excluded evidence of a 1978 criminal conviction of the Bank which apparently resulted from improper campaign contributions. The district court reasoned that the risk of prejudice substantially outweighed any probative value the conviction had for attacking a small portion of a bank officer's testimony that the Bank would not hire dishonest persons. *See* Fed.R.Evid. 403. The district court's determination can only be reversed for an abuse of discretion. *United States v. Feldman,* 136 F.2d 394, 399, (2d Cir.1943), *aff'd,* 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408 (1944). Based upon our review of the record, we are not prepared to say that the district court abused its discretion in excluding this "other crimes" evidence, which may be admissible under the terms of Fed.R.Evid. 404(b).

rate is limited by the marketplace and requires periodic redetermination, in good faith and in the ordinary course of business, of the price to be charged to all of the bank's customers similarly situated, then the note is not too indefinite. *Id.* at 237, 425 A.2d at 1270–71. *Accord Bank of Maine, N.A. v. Weisberger,* 477 A.2d 741, 744 (Me.1984); *Powell v. Central California Federal Savings & Loan Ass'n,* 59 Cal.App.3d 540, 549, 130 Cal. Rptr. 635, 640–41 (1976); *Restatement 2d of Contracts,* § 34(1) and comment a. Certainly, the evidence submitted by the Bank and testimony of the bank officer unequivocally show that the interest rate was set according to the fluctuation in the prime rate, was redetermined as the rate changed, and did apply to all similarly situated bank customers, i.e. those customers with loans in the same category. The Bank did not have unfettered discretion in setting the interest rate on Mr. Walters' loan. As such, we believe that Tennessee courts would conclude that the terms of the note were sufficiently definite to be enforced.

 Walters also advanced the argument that even if the collection of interest in certain instances was not usurious, it nonetheless breached the contract because the maximum interest rate under his promissory note was limited by usury laws in force as of May 3, 1979, the date he obtained the $475,000 loan, and not as of the date the interest was collected. The plain language of the note is contrary to Walters' interpretation: ·

> The rate of interest on the unpaid principal balances of the indebtedness hereby evidenced shall be adjusted as of each day that the prime rate is changed; provided, always, however, that notwithstanding any changes in said prime rate, the *rate of interest hereon prior to maturity shall never be more than the maximum lawful contract rate which a national bank, having its principal place of business in the State of Tennes-*

> *see, may lawfully charge from time to time....* It is the intention of the maker and the bank to contract in strict compliance with the usury laws as set forth at 12 U.S.C. § 85, and the law of the State of Tennessee incorporated therein by reference; and, accordingly, in no event and upon no contingency shall the bank ever be entitled to receive, collect, or apply as interest any interests, fees, other payment equivalent to interest, in excess of the maximum contract rate which may, *from time to time,* be lawfully charged to the maker hereof under the applicable law by a national bank having its principal place of business in the State of Tennessee. (emphasis added).

Clearly, the Bank was not limited by the maximum rate in effect on the day of signing, but could charge interest limited by the rate ceiling and usury laws in effect as they changed "from time to time." Our conclusion on this issue also necessarily disposes of Walters' remaining, related claim that by charging interest in excess of that allowed under usury laws in effect on May 3, 1979, the Bank committed an anticipatory breach of the contract which excused Walters from fulfilling his obligations under the note.[4]

*The Judgment NOV*

 Although all of the usury claims in the derivative action were dismissed in the summary judgment order, certain of Walters' usury claims on his personal loan did go to the jury. The district court had ruled that the two year statute of limitations barred Walters' usury claims prior to May 22, 1980, a ruling which Walters has not challenged. The district court also ruled during the course of the trial that as a matter of law any usury claims after October 8, 1980, on the personal loan necessarily failed based upon the court's construction of certain state and federal interest rate statutes.[5] Consequently, the jury was

---

**4.** Assuming, *arguendo,* that the Bank did so violate the contract, Walters still would have no claim for anticipatory breach, because the Bank had substantially performed under the contract.

*See Constitutional Bank & Trust Co.,* 425 A.2d at 1270.

**5.** Walters superficially challenges the district court's construction of Pub.L. No. 96–221 and

presented with usury claims on the personal loan based on overcharges totalling $337.06 between May 29, 1980 through June 8, 1980, and from September 8, 1980 through September 25, 1980.

Specifically, the district court submitted the issue to the jury by means of the following special interrogatory:

> Did the defendant First Tennessee Bank knowingly take or receive from or charge to the plaintiff William S. Walters, Jr. interest in excess of the lawful rate on the $475,000.00 note signed May 3, 1979, between the date of its signing and December 2, 1980?

The district court further instructed the jury that:

> The word "knowingly" means intentionally receiving interest in excess of the amount authorized by appropriate laws. Knowingly does not include collecting interest above the lawful amount due to a mistake of fact or by an unintentional error of fact.

The jury responded "yes" to the special interrogatory.

We believe that the district court properly rejected the jury's verdict for Walters and entered judgment NOV. The only testimony at trial regarding the Bank's overcharge was that of Mr. Dudley. His testimony at trial with regard to the $475,-000.00 loan corroborated and mirrored his affidavit, discussed above in conjunction with the summary judgment for the Bank on the Ten Tex loan usury claims. As in his affidavit, Dudley testified that the two overcharges resulted from inadvertent clerical oversight, i.e. a Bank employee's failure to enter the lower usury ceiling on the computer when the federal discount rate dropped. In addition, similar programming oversights occurring when the discount

rate and usury ceilings rose resulted in the Bank's undercharging Walters more than it ever overcharged him. Indeed, the Bank's undercharges preceded any overcharges. In face of this evidence which at most established negligence on the part of the Bank, Walters presented no contradictory testimony or evidence. His argument on appeal centers around a theory that the Bank committed usury because it "knowingly" made a choice to use a computer system which permitted such errors to occur. However, this argument only permits one to conclude that the Bank was negligent. As such, the district court correctly entered a judgment NOV. Viewing the case in a light most favorable to Walters, and drawing all reasonable inferences in his favor, there simply was an absence of proof of knowing conduct by the Bank, an essential element of usury under 12 U.S.C. § 86 which Walters had the burden of proving "convincingly," *Wheeler v. Union National Bank of Pittsburgh*, 96 U.S. 268, 270, 24 L.Ed. 833 (1878).

### III.

We have thus considered the numerous issues in this appeal, and conclude that the district court's judgment was correct in all respects. In so doing, we carefully and fully reviewed all of the arguments raised by the parties and the voluminous record in this case. Accordingly, the judgment of the district court is hereby **AFFIRMED.**

Pub.L. No. 96–399 in its appellate brief by simply referencing its trial memorandum. We cannot countenance this attempt to circumvent Fed.R.App.P. 28(g) and its limitation on appellants' briefs to 50 pages. As stated in *Katz v. King,* 627 F.2d 568 (1st Cir.1980): "If counsel desires our consideration of a particular argument, the argument must appear in the four corners of the brief filed in this court." *Id.* at 575. Insofar as Walters argues that this federal legislation, which preempted state usury ceil-

ings and granted interest rate relief to banks during and after 1980, constitutes an unconstitutional impairment of the contract, we note that no court has ever declared these statutes unconstitutional. Moreover, the contract Walters signed expressly contemplated that the interest rate charged and allowed by law would or could fluctuate from "time to time," which negates his contention that the rate in effect on the date of signing of the contract was the maximum rate that could ever be charged.