**Mary Ann CLARK, Plaintiff–Appellant,**

v.

**ALCAN ALUMINUM CORPORATION, Defendant–Appellee.**

No. 00–6040.

United States Court of Appeals, Sixth Circuit.

July 23, 2002.

768

Before CLAY and GILMAN, Circuit Judges; and HAYNES, District Judge.*

The Honorable William J. Haynes, Jr., United States District Judge for the Middle District of

## OPINION

HAYNES, District Judge.

Plaintiff–Appellant, Mary Ann Clark, appeals the District Court's order granting summary judgment to Alcan Aluminum Corporation ("Alcan"), her former employer, on Clark's employment discrimination claims under the Kentucky Civil Rights Act, Ky.Rev.Stat. Ann. § 344.010, *et seq.* (Banks–Baldwin 2001) ("Act"). On appeal, Clark contends that she presented sufficient evidence to give rise to an inference of "a campaign" of racial discrimination, citing her reassignment during a 1992 company reorganization and her 1995 demotion. Clark further contends that the District Court erred in finding that (1) her claim on the 1992 job transfer is time barred, and (2) that under the Kentucky Civil Rights Act, an employer's business judgment should receive greater scrutiny than under the analogous federal antidiscrimination law, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). For the reasons set forth below, we AFFIRM the judgment of the District Court.

## I. BACKGROUND

Clark, a Kentucky resident, originally filed this action in the Jefferson Circuit Court in Louisville, Kentucky on December 15, 1997, alleging that Alcan discriminated against her because of her race in violation of the Act. Clark alleged that she ultimately was forced to resign in November 1995 as a result of Alcan's discrimination. (J.A. at 11.) On December 30, 1997, Alcan, an Ohio corporation, removed this action to the District Court without objection. (J.A. at 4, 23–55.) After discovery, Alcan moved for summary judgment.

Tennessee, sitting by designation.

Upon consideration of Clark's opposition motion and memorandum and Alcan's reply, the District Court entered judgment in favor of Alcan. Clark filed a timely appeal to this Court.

Clark began her tenure with Alcan as a switchboard operator in 1978. Clark subsequently held the positions of production clerk from 1979 to 1984, quality control technician from 1984 to 1987, production control planner from 1987 to 1992, customer service representative from 1992 to 1995, and quality control technician until November 1995.[1] (J.A. at 282, 345–46.) Clark contends that the job moves from switchboard operator to quality control technician were promotions, while the remaining position changes were demotions. Although Clark characterizes the transfer from production control planner to customer service representative as a demotion, this proposition is not supported by the record. (J.A. at 359–60.) Clark's verified complaint, however, does reflect that the customer service position was not a "career path position," and had fewer opportunities for career advancement. (J.A. at 10.) The move from customer service representative to quality control technician was a demotion, and caused Clark to lose her exempt status. Clark further contends that while she served as quality control technician, three positions opened, but she was not offered any of them. (J.A. at 347–52.)[2] Clark also contends that she was subjected to numerous discriminatory practices, mostly at the hands of Cynthia

Carroll, who served as Alcan's general manager from November 1991 to July 1995. (J.A. at 57.)

Alcan manufactures foils and packaging for applications in various industries. *Id.* In the Spring of 1992, Phillip Morris, Inc. ("PMI") awarded Alcan a new contract to supply over 95 percent of PMI's foil packaging requirements. (J.A. at 59.) During the period about which Clark complains, Carroll was responsible for all decisions regarding promotions, transfers, demotions, job restructuring, consolidation and other staff-related decisions. (J.A. at 57.) On October 15, 1992, Carroll informed employees of several organizational changes, including the reassignments of Clark and five other employees to different positions as a result of the PMI contract. (J.A. at 58.) Alcan moved Clark from production control planner to customer service representative. In the latter position, Clark reported to Sheryl Craig, who was also moved to sales representative. *Id.* In her new position, Craig reported to Jim Kupper. Jim Tegart, a white male, moved into Clark's former position as production control planner. (J.A. at 59.) As production control planner, Clark had reported to Ed Rausch, and when Tegart assumed Clark's former position, he reported to Rausch as well. (J.A. at 59, 284.) Clark contends that Carroll moved her out of the production planner position so that Tegart could move into that spot to become production supervisor once Rausch retired. (J.A. at 284–86.) Clark admits that Tegart was

---

**1.** Although Clark's brief asserts that she served as quality control technician-from 1995 to 1997, Clark's complaint alleges that she left "active employment" with Alcan in November 1995. (J.A. at 11).

**2.** Although Clark points to an alleged denial of certain positions and/or promotions in her "Statement of Facts," she presents no argument or analysis regarding these claims in the "Argument" section of her brief, and thus, she

has abandoned these claims on appeal. *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 43 F.3d 1054, 1058 (6th Cir.1995). Clark argued before the district court that she had been denied certain promotions, but the district court rejected her claims because she failed to show (1) any specific promotions she had been denied, (2) that she was qualified for those promotions, or (3) that she was treated differently from others outside of her protected class. (J.A. at 18.)

qualified for the position of production control planner, a position he previously held. (J.A. at 286.) Clark also admitted that she was uncertain whether the decision to move Tegart into that position was made because she was African American. (J.A. at 291.)

On May 1, 1994, Tegart was moved to the newly created position of production scheduling and materials manager, reporting to Rausch. (J.A. at 60.) When Rausch later retired, Tegart assumed Rausch's duties. (J.A. at 60.) According to Carroll, Tegart did not technically replace Rausch. Although Alcan presents no job description for the position of production scheduling and materials manager, Alcan relies upon Carroll's affidavit that Clark was not qualified for that position because that position required supervisory experience that Clark admitted she lacked. (J.A. at 60–61, 283.) Carroll also notes that Clark was never considered for the position because she never applied for it. (J.A. at 61.) Carroll explained that Tegart had a long history of good evaluations, while at that point, Clark's evaluations were marginal at best. (J.A. at 61.) Further, Tegart's previous experience as a supervisor of shipping, receiving and packaging was vital to the new position. Finally, Tegart was more qualified academically for the position because he had a master's degree in business management, while Clark had taken only a few college courses toward her undergraduate degree. (J.A. at 60–61.)

Clark believes that her move from production control planner to customer service representative was designed to ensure that she would fail. Clark argues that she was moved around the department about five or six times, and unlike other employees, more than one person evaluated her. (J.A. at 292.) During 1993 and 1994, Clark contends that her job as customer service representative was more difficult than normal because other customer service representatives were allowed to take vacation at the same time, and she had to cover for them. (J.A. at 329–30.) Clark testified that Craig and Kupper would run in and out of her office asking her questions, which made it difficult for her to perform her job. (J.A. at 325–28.) Clark considered this behavior rude, but, significantly, stated that she did not think race played a role in their actions. (J.A. at 328.)

Clark also complains about her poor performance evaluations during her tenure as customer service representative. On March 12, 1993, Craig gave Clark a three-month performance evaluation for this customer service position and stated that Clark "felt she was still in a training mode and was reacting in a prompt manner to complaints, inquiries, etc." (J.A. at 63.) Clark, however, was still learning her job. *Id.* This evaluation reflects Clark's statement that "someone was always trying to make her look bad." *Id.* Craig told Clark that "everyone makes mistakes and that she should not worry about it and just do the best she can do." *Id.* Clark denies the comments Craig attributes to her. Clark also contends that she received a positive oral review, but the written evaluation contained only negative comments regarding her performance. (J.A. at 303–04.)

On June 3, 1993, Kupper and Craig met for Clark's six-month evaluation. (J.A. at 65.) This evaluation reported that Clark was doing a good job in handling bids and entering orders for a "school hooding program," *id.*, but Kupper and Craig discussed how to deal with Clark's problems in other areas. (J.A. at 66.) Clark Food Service, a customer, filed a written complaint alleging that it had received damaged freight and consequently requested a refund. *Id.* Clark failed to process the refund and later "upset" the customer who called Alcan's sales manager. The custom-

er eventually received the refund. *Id.* According to Clark, the customers were demanding and she did not like telling them bad news. *Id.*

In September 1993, Craig and Kupper administered Clark's nine-month evaluation, in which she received a "competent" in ten categories, "adequate" in six categories, and "marginal" in five categories. (J.A. at 67–72.) The report also contained several critical comments, such as Clark "does not pay attention to details nor consistently follows up on items whether they are internal or external. She becomes flustered when talking to both manufacturing representatives and customers . . . and prefers to communicate positive information and is reluctant to communicate negative." *Id.* As to ensuring the accuracy of current customer product specifications and pre-specifications, the evaluation stated that Clark "often omits critical information or transcribes inaccurate information." *Id.* For Alcan's annual Christmas gift wrap program, "Clark still seem[ed] confused about the logistics and responsibilities of handling the program." (J.A. at 68.) The report stated that without supervision, Clark has a difficult time analyzing problems and identifying solutions in some areas. *Id.* Finally, this evaluation noted that Clark had been in the position for about ten months, and that her performance had declined since her June review, that she was "habitually tardy," and that her "personal phone calls ha[d] taken priority over doing her job." (J.A. at 70.)[3] After outlining the complaints regarding Clark's performance, Alcan told her after the September 1993 review that if she did not improve, she would be terminated. (J.A. at 147–48.) Clark was also informed that

she would be re-evaluated in 60 to 90 days. *Id.*

In the December 1993 evaluation, however, Clark showed marked improvement. (J.A. at 90–93.) For her "Overall Job Performance," the evaluation stated that her supervisors had noticed a "sincere effort" on Clark's part to address the cited deficiencies in some areas of her performance. *Id.* "Her attention to detail and accuracy regarding typing of memorandums, inquiries, and complaints ha[d] improved . . . [and][t]he primary areas of concern [were Clark's] communication with the customers and other disciplines within Alcan." *Id.* The evaluation also noted that Clark had been getting to work on time and was not spending time on personal telephone calls. *Id.* Yet, this evaluation also stated that Alcan was "concerned whether [Clark] could handle the job in a competent manner and would rate her as an adequate [sic] at this time." *Id.*

Sales manager Gary Hutcherson replaced Craig as Clark's direct supervisor as of March 1, 1994. On July 5, 1994, Craig and Hutcherson evaluated Clark's performance. Craig noted that for the prior six months, Clark had performed at an adequate level. (J.A. at 14.) While noting Clark's efforts to improve her performance by organizing her workload, this evaluation reported Clark's need to follow up processing complaints through the system, her need for direction, her lack of an appreciation for customer service and her difficulty in working under pressure. (J.A. at 114.) Hutcherson's review of Clark's performance delineated several instances where Clark's lack of follow-up or communication with him or others contributed to

---

**3.** Alcan attached extensive documentation regarding the problems identified in the evaluation. Some of the documentation involved customer complaints, naming Clark and calling her performance inadequate, letters from Clark to Alcan's customers with numerous typographical errors, and documentation regarding customer orders on which Clark included incorrect information. (J.A. at 72–73, 76–77, 80–81.)

jeopardizing customer accounts, including one account "representing over $425M" in business. (J.A. at 116–17.) The evaluations also attached the customer complaints and documented Clark's other performance errors during this period. (J.A. at 118, 119, 120.) Clark does not dispute any of these incidents. Clark argues, however, that the evaluations should be disregarded because they were intended to get rid of her and that the problems delineated therein were not her fault.

For her claim of racially disparate treatment, Clark insists that Carroll was racist, citing the fact that the only other two salaried black employees left the company after Carroll assumed her duties as general manager. (J.A. at 311.) Carroll terminated an African–American secretary. Later, an African–American accountant was "humiliated" and resigned. (J.A. at 293.) In November 1992, Craig told her that there were "prejudiced" people in Alcan's employ. (J.A. at 334.) Clark, however, admitted during her deposition that she did not know the job performance or performance evaluations of any of these employees. (J.A. at 293–96.) Clark also admitted that whites were also either fired, laid off, or had their positions eliminated during Carroll's tenure as general manager. (J.A. at 336.)

In April 1995, Carroll informed Clark that she was being demoted to quality control technician, a position that Clark had previously held. (J.A. at.313–14.) The only evidence Clark presents that this demotion was due to her race is her deposition testimony that Carroll did not like blacks. (J.A. at 316.) Clark contends that after she was demoted, she complained to Alcan's equal employment officer, who met with her once, but never followed up after promising he would. (J.A. at 317–18.) Clark ultimately left the company, apparently on disability. (J.A. at 11.)

## II. ANALYSIS

This Court reviews a district court's order granting summary judgment *de novo*. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir.2000). Summary judgment is appropriate where genuine issues of material fact are absent and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The Court must view the evidence and draw all reasonable inferences therefrom in a light most favorable to the non-moving party. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir.2000). Yet, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Clark asserts race discrimination claims under the Kentucky Civil Rights Act. *See* Ky.Rev.Stat. Ann. § 344.040 (Banks–Baldwin 2001).[4] "Because Ky. Rev. St. Chapter 344 mirrors Title VII of the Civil Rights Act of 1964, we use the federal standards for evaluating race discrimination claims." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir.2000) (citing *Kentucky Commission on Human Rights v. Kentucky*, 586 S.W.2d 270, 271 (Ky.Ct. App.1979)); *Wathen v. General Elec. Co.*, 115 F.3d 400, 405 (6th Cir.1997); *see also*

---

**4.** That section states: "It is an unlawful practice for an employer: to ... discharge any individual or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment, because of the individuals' race...." *See* Ky.Rev.Stat. Ann. § 344.040 (Banks–Baldwin 2001); *see also id.* at § 344.080 (explaining that it is unlawful for a person to conspire to discriminate in any way described in the chapter).

*Ammerman v. Bd. of Educ. of Nicholas County*, 30 S.W.3d 793, 797–98 (Ky.2000) (explaining that the Kentucky Civil Rights Act and Title VII are "similar" and "should be interpreted consistently").

Clark characterizes Alcan's actions as a "campaign of racial discrimination"[5] that began in 1992 with her removal from the "career path position" of production control planner to customer service representative. Clark contends that she was further discriminated against in 1995 when she was demoted from customer service representative to quality control technician, a position that she had previously held. Clark also challenges several actions that occurred during her tenure as customer service representative that she contends exhibit the campaign of discrimination waged against her. These acts include her negative reviews and the fact that unlike others, she was evaluated by more than one person. Clark also refers to the fact that she was transferred around the department five or six times and the fact that she had to assume everyone else's duties while they were on vacation at the same time.

### 1. Statute of Limitations

Alcan first argues that Clark's claim on the 1992 reorganization is time barred by the applicable Kentucky statute of limitations. As a federal court sitting in diversity, this Court applies the law of the forum state. *See Kurczi v. Eli Lilly and Co.*, 113 F.3d 1426, 1429 (6th Cir.1997) (citations omitted). Under Kentucky law, "[c]ivil rights claims are governed by the five-year statute of limitations provided in KRS 413.120(2)." *Ammerman*, 30 S.W.3d at 798. Clark filed this action in December 1997, but she received notice in October 1992 of the move from production control planner to customer service representative. Thus, Alcan argued before the district court and here on appeal that the five-year statute of limitations barred that claim.

■ Clark contends that this Court should consider the 1992 move from production control planner to customer service representative under the continuing-violation doctrine. *See Ammerman*, 30 S.W.3d at 798–99. In *Ammerman*, the Kentucky Supreme Court described that doctrine as follows:

> In a ... harassment lawsuit, the limitations period begins on the date the act occurs. Yet if the discriminatory act constitutes a "continuing violation," an equitable doctrine often used in hostile environment claims, then such limitations period begins to run anew with each succeeding discriminatory act. Generally, "those violations preceding the filing of the complaint by the full limitations period are foreclosed," yet the continuing violation doctrine may allow a plaintiff to bootstrap incidents that

**5.** Clark's brief on appeal might be read to allege a claim of "racial harassment," in that she complains of a campaign of racial discrimination. *See Newman v. Fed. Express Corp.*, 266 F.3d 401, 405 (6th Cir.2001) (explaining that Title VII proscribes racial harassment that creates a hostile or abusive work environment). The Kentucky Civil Rights Act also protects against discriminatory harassment. *See Ammerman*, 30 S.W.3d at 798. However, Clark does not argue that she is asserting a racial harassment claim. Rather, she challenges specific "adverse actions" and then points to other actions taken by her supervisors as further evidence that she has raised an inference of racial discrimination. Moreover, she has pointed to no incidents in which anyone ever said anything to her that had to do with race, except for one comment that Craig made that some people at Alcan were prejudiced. *See Newman*, 266 F.3d at 405 (hostile work environment claim fails where all that is shown are offhand comments, simple teasing or isolated incidents, unless extremely serious).

occurred outside the statue of limitations onto the sexual harassment claim. *Id.* at 798.[6]

The Kentucky Supreme Court noted that in determining whether to apply the doctrine, courts should consider (1) whether the alleged acts involve the same type of discrimination; (2) the frequency of the acts, i.e., whether they are recurring or more in the nature of an isolated employment decision; and (3) whether they have a degree of permanence, such that an employee should have realized the need to assert her rights. *Id.* at 798–99.

Clark contends that she did not realize the existence of racial discrimination until her ultimate demotion in 1995 and other events that placed the 1992 incident in the "proper light." Therefore, she contends that the 1992 transfer should fall under the continuing-violation doctrine. In other words, it was only as a result of all of the incidents that occurred that she realized that the action taken against her in 1992 was the result of discrimination.

The Court concludes that Clark has waived this continuing-violation argument on appeal because Clark, who was represented by counsel, did not respond to the statute of limitations defense in the District Court. "It is well established that where a plaintiff fails to assert in district court that the statute of limitations has been tolled, [s]he can not raise it for the first time on appeal." *Walters v. First Tennessee Bank, N.A.,* 855 F.2d 267, 271 (6th Cir.1988). Clark does not respond to Alcan's argument that she failed to raise the continuing-violation doctrine or tolling before the district court and thus cannot assert it here. She merely argues the merits of her claim and contends that this

Court should consider the 1992 transfer under the continuing-violation doctrine. Thus, Clark is barred from asserting on appeal that the statute of limitations is tolled under the continuing-violation doctrine. *Walters,* 855 F.2d at 271; *accord Roberts v. Berry,* 541 F.2d 607, 610 (6th Cir.1976) (holding that because the plaintiff did not argue before the district court that the statute of limitations was tolled on statutory grounds as to his loss of consortium claim for the period of time the defendant was outside of the state, the plaintiff could not raise it for the first time on appeal).

Even if the continuing-violation doctrine were to apply, Clark must cite a discriminatory act that occurred within the limitations period. *See Ammerman,* 30 S.W.3d at 799–800. Alcan contends that because Clark has failed to show that the incidents that allegedly occurred within the limitations period were racially motivated, her claims fail. The Court agrees that Clark fails to point to any racially-motivated discriminatory acts within the limitations period and therefore the 1992 transfer should not be considered, even if the continuing-violation doctrine applied. *Id.* As discussed below, even if the merits of the 1992 transfer claim were considered, Clark lacks sufficient evidence of racial discrimination.

Without direct evidence of discrimination, Clark must rely on the burden-shifting allocation in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to prove her discrimination claims. *See Hartsel v. Keys,* 87 F.3d 795, 800 (6th Cir.1996). To establish a *prima facie* case and create a presump-

---

6. Under Title VII, the statute of limitations begins to run when a plaintiff has notice of an alleged discriminatory act. *See e.g. Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) (explaining

that in determining when the limitations period starts, "the proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful") (citation omitted).

tion of discrimination, Clark must show: (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that she was otherwise qualified for the position(s); and (4) that following her rejection, someone outside of her protected class obtained the position(s). *Id.*

In describing the types of actions that might constitute a materially adverse employment action, this Court has explained:

[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir.1999) (citation omitted).

Clark contends that she has established the first three prongs of her *prima facie* case, because she is African American and has suffered at least two adverse employment actions. If Clark establishes a *prima facie* case of discrimination, the burden then shifts to Alcan to articulate a legitimate, nondiscriminatory reason for the employment action at issue. *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 728–29 (6th Cir.1999). Alcan's burden is only one of production; the burden of proving unlawful discrimination, i.e., the burden of persuasion, remains at all times with Clark. *Gray v. Toshiba America Consumer Products, Inc.*, 263 F.3d 595, 599 (6th Cir.2001) (citation omitted). If Alcan meets this burden, the burden shifts to Clark to show that Alcan's proffered reasons were pretextual. *Warfield*, 181 F.3d at 729. Clark may establish pretext by

showing (1) the proffered reason had no basis in fact; (2) the reason was not the actual reason; or (3) the stated reason was insufficient to explain Alcan's action. *Logan v. Denny's, Inc.*, 259 F.3d 558, 567 (6th Cir.2001).

2. Clark's 1995 Demotion to Quality Control Technician

■ Alcan does not dispute that the 1995 transfer of Clark from customer service representative to quality control technician was a demotion. "In order to show that [s]he was qualified, [Clark] must prove that [s]he was performing [her] job 'at a level which met [her] employer's legitimate expectations.'" *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir.1990) (citation omitted). The record establishes that Clark suffered from numerous performance problems while she served as customer service representative. Many of the complaints came from customers. In her reply brief, Clark cites *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir.1999), for the proposition that raising an inference of discrimination is not a high burden, and contends that she established a *prima facie* case of discrimination.

■ Even if Clark could arguably be said to have established a *prima facie* case of discrimination with respect to her 1995 demotion, she has failed to rebut Alcan's legitimate reason for demoting her—her poor performance in customer service. In her reply brief, Clark attempts to raise factual issues regarding her performance reviews by contending that she was sabotaged by being reviewed by multiple reviewers, switched around the department five or six times, required to assume others' duties while everyone else was on vacation, and purposely distracted by her supervisors, who would ask her questions throughout the day in an effort to make

sure she failed at her duties. Yet, Clark has failed to adduce any evidence or "cold hard facts" that any of this had to do with her race. *See Handley,* 827 S.W.2d at 700–01. While Clark claims that she was treated differently than everyone else, she does not identify a particular employee to whom she was similarly situated and who was treated differently. In addition, many of the incidents that led to Clark's less than favorable reviews involved complaints by customers. Alcan produced memoranda that Clark sent out with numerous typographical errors and pointed to specific examples of how her inattention to detail resulted in errors. The record reflects documented discussions evidencing that Alcan, and particularly Craig, offered Clark ways to improve her performance.

Clark contends that she was transferred for the sole purpose of being sabotaged and set up to fail in the customer service position, which the record shows involved a fair amount of responsibility. If Carroll wanted to fire Clark, however, she could have done so after reviewing some of Clark's evaluations as a customer service representative. But Carroll chose not to fire Clark. Further, although Clark received negative performance reviews as a customer service representative and was ultimately demoted, she kept her position for two years, was counseled on how to improve, and given several chances to do so. These facts do not support any inference of racial discrimination. Clark's subjective belief that her supervisors were part of a plan to sabotage her work is legally insufficient. Clark must present evidence that race played a role in her receiving these reviews. *See Handley,* 827 S.W.2d at 700–01.

■ Finally, Alcan contends that Clark's evaluations in and of themselves do not constitute an adverse employment action. We agree. *See e.g., Primes v. Reno,* 190 F.3d 765, 767 (6th Cir.1999) ("If every

low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure."). The Court concludes that in light of Alcan's documentary evidence, Clark fails to show that she deserved better evaluations or that her performance evaluations were racially motivated.

Clark also contends that this Court should more carefully scrutinize Alcan's business judgment because, under Kentucky law, the Act permits compensation for adverse impact on personal dignity and/or humiliation. *See Meyers v. Chapman Printing Co., Inc.,* 840 S.W.2d 814, 817 (Ky.1992). In *Meyers,* the Kentucky Supreme Court explained:

> One important purpose of the Kentucky Civil Rights Act was to incorporate the anti-discrimination "policies embodied" in the Federal Civil Rights Acts of 1964 [Title VII]. It is Title VIII ... which addresses employment discrimination based on "race, color, religion, sex, or national origin." But there are further purposes expressed in the Kentucky statute not specified in the Federal, including "protect[ing] ... personal dignity and freedom from humiliation." KRS 344.020(1)(b). Whereas the policies embodied in the Kentucky Act are the same as the federal counterpart, the statutory remedy provided through the court system differs markedly because of these further policy statements and because of the difference in remedy provided in KRS 344.450 as contrasted with those provided in the Federal Act....

*Id.*

Clark contends that in light of Kentucky's stated policy regarding discrimination claims, this Court cannot evaluate Clark's claims based on Alcan's written documentation, such as personnel reviews.

Rather, "[d]ignity can be threatened and/or conduct can humiliate by an act, attitude, comment, or slight which involves little or no trail of documents." Clark contends that in such cases, Alcan should not be allowed to rely on "business judgment" for making personnel decisions. Clark essentially contends that because she was forced out of her career-path position, and placed into the customer service position where she was allegedly sabotaged and ultimately demoted, she faced humiliation daily. We find none of these arguments persuasive.

First, Clark does not cite any authority for the proposition that, under the Kentucky Act, an employer's "business judgment" merits greater scrutiny than it would receive under federal law. Nor does Clark cite authority for the proposition that this Court should ignore documentation or evidence regarding her performance reviews or Alcan's business judgment on employment decisions that affected Clark. The Kentucky Supreme Court has explained that the Act "was not intended as a vehicle for judicial review of business decisions regarding terminations." *Harker*, 679 S.W.2d at 231. Rather, the Act is intended to "safeguard" Kentucky citizens from unlawful discrimination. *Department of Corrections v. Furr*, 23 S.W.3d 615, 617 (Ky.2000).

In sum, the Court concludes that Clark is barred by the Kentucky statute of limitations from raising the 1992 transfer from production control planner to customer service representative. Clark did not raise any issue of equitable tolling before the district court, and is therefore barred from raising the issue in this Court. Furthermore, even if the 1992 claim is considered and assuming Clark established a *prima facie* case of discrimination on this claim, Clark does not present any evidence, other than speculation, that her move was racially motivated rather than the result of a company reorganization that affected five other employees, including white employees.

Clark also fails to show that Alcan made the 1995 employment decision for illegitimate reasons. Specifically, Clark has failed to rebut Alcan's reason for her 1995 demotion—her documented performance deficiencies. Without proof that this decision was racially motivated, Clark cannot recover for any humiliation and loss of dignity that she contends she suffered as a result of the alleged discrimination. *Cf. Meyers*, 840 S.W.2d at 819 (allowing Plaintiff to recover for humiliation and personal dignity where she prevailed on her sexual harassment claim).

## III. CONCLUSION

For these reasons, we AFFIRM the district court's judgment.