Phil A. **STREET** and Clyde H. Street, Plaintiffs–Appellants,

v.

**J.C. BRADFORD & COMPANY, et al.,** Defendants–Appellees.

No. 87–5673.

United States Court of Appeals, Sixth Circuit.

Argued May 26, 1989.

Decided Sept. 21, 1989.

Vincent A. Sikora argued, Richard W. Pectol and Associates, Johnson City, Tenn., Richard W. Pectol, for plaintiffs-appellants.

Ed W. Williams, III, Johnson City, Tenn., Frank A. Johnstone argued, Katherine W. Singleton, Wilson, Worley, Gamble & Ward, Kingsport, Tenn., for defendants-appellees.

Before MILBURN, Circuit Judge; CELEBREZZE, Senior Circuit Judge; and BERTELSMAN, District Judge.[*]

BERTELSMAN, District Judge.

## INTRODUCTION

This is a securities/commodities fraud action, originally brought in the United States District Court for the Eastern District of Tennessee. It alleges a broker's violations of the Commodity Exchange Act, 7 U.S.C. §§ 6, 6a, 6c, 6d, 6o and 25; the Securities Act of 1933, 15 U.S.C. §§ 77l and 77q; the Securities Exchange Act of 1934, § 78(b), 17 C.F.R. §§ 240.10b–5 and 240.-17a–3; and the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 and 1964;[1] and several pendent state claims. Appellants (plaintiffs in the court below) challenge on appeal the district court's summary judgment orders dismissing all of plaintiffs' claims and upholding defendants' counterclaim for a deficiency balance due on plaintiffs' account.

In the interests of brevity, the appellees are referred to collectively to include J.C. Bradford & Co., the commodities exchange brokerage firm; Ken Graybeal, a local securities broker authorized only to accept and transmit commodities trades to a commodities broker in another of the firm's offices; Robert McCrackin, Douglas O. Kitchens, and Ray Richardson, all commodities brokers in the J.C. Bradford organization alleged to have advised appellants or transacted trades for them. Graybeal was the main point of contact between appellants and the firm.

## FACTS

The facts are greatly summarized for the purposes of this opinion. Of course, as the law requires, all disputed facts and inferences are resolved most favorably to appellants.

Plaintiffs complain about events which can be chronologically divided into three periods: (1) fraudulent representation made to Phil Street at the time his silver commodities account was opened in January of 1982; (2) failure to complete orders to sell short on February 25, 1983; and (3) after execution of a release on March 2, 1983, the conduct of unauthorized trading on Phil Street's commodities account and the making of fraudulent representations regarding the defendants' ability to recoup losses suffered on February 25, 1983.

Phil Street[2] testified that, when he opened his account, defendants represented to him that all commodity trade orders could be filled within four to four and one-half minutes of being placed.[3] Moreover, he claims he was told that the maximum amount that a silver securities contract could drop in a given day was 50 cents per ounce. Therefore, the Streets were under the impression that they could readily stop their losses if the market started to drop. On February 25, 1983, however, the silver futures market suffered a severe letdown. Plaintiffs allege that orders to make certain trades on Phil Street's account were not filled and that the Streets suffered major losses, in violation of defendants' earlier representations and fiduciary duties towards plaintiffs.

The severe drop in the market resulted in a loss in Street's account of approximately

---

[*] The Honorable William O. Bertelsman, U.S. District Judge for the Eastern District of Kentucky, sitting by designation.

[1.] The parties have stipulated that the law would be the same under the federal securities and commodities statutes. We agree with Judge Milburn's analysis of the Commodities Exchange Act as expressed in his concurring opinion, but are of the view that the parties' stipulation controls this court's approach on appeal. The Commodities Exchange Act, although it was plead, was not argued to the trial court, either. We believe that whether the parties are permanently bound by this approach is a matter best left to the trial court on remand.

[2.] Phil Street and his father, Clyde Street, traded on the account maintained in the name of Phil Street.

[3.] The defendants counter that common sense would tell one there would have to be a buyer for orders to go through, but the Streets testified this was never explained to them. We cannot say that this would be obvious to one not familiar with the intricacies of the commodities market.

$200,000. The defendants demanded that these losses be made good, issued appropriate margin calls, and threatened to sell Phil Street out and "close his business" if the margin calls were not met. The Streets countered by pointing out that Clyde Street's orders to sell short had not been filled, in violation of the representations that orders could be filled in four and one-half minutes.

The parties met at the local airport on March 1, 1983. They rehashed their positions for four hours. According to the Streets' testimony, the defendants promised that if Clyde Street would mortgage his farm and raise the money to meet the margin calls, the defendants would credit the Street account with $50,000. The Streets are adamant that no mention was made of a release at this meeting.

According to Phil Street, he was unwilling to give up most of his leverage by paying the defendants any money, but on the way back to town from the meeting, Graybeal pleaded with him for the sake of old friendship to save Graybeal's job by inducing Clyde Street to raise the money. According to Street, Graybeal promised to make up the losses by continuing trading. Phil Street testified that Graybeal, invoking friendship, specifically promised: "Get your dad to cover this thing and I'll make it up. We'll make it up. There will be no problem." R.586. Phil Street did not regard this as mere puffing, but interpreted it as a promise to use special efforts and even inside information [4] to recoup the losses. Phil Street persuaded his father to raise more than $150,000 to pay to the defendants as a result of Graybeal's appeal to friendship, lamentations that he would lose his job, and promise that all losses would be made up.

On March 2, Phil Street happened to be in the defendants' local office. This was when the release was drafted and signed. Phil Street described the circumstances thus:

"Now that situation there, if you'd like for me to elaborate on it was a situation my father knew nothing about. Again it was a bad situation. We were dealing in my account.... *After we had—I had talked my father into agreeing to mortgage his farm and get the money to get the account up to date,* I walked into J.C. Bradford one day. As I said I was not there every day, but I did go down that day, and when I went in Kent said, 'Phil, come back here. Mr. Kitchen wants to talk to you.' And so I got on the telephone with Mr. Kitchen,.... He said 'I'm going to dictate a form there to one of Ken's secretaries and you need to sign it.' And I said 'Well, I don't care to sign anything,' at that time, you know, 'I've signed enough things I think and I don't need to sign anything else.' *And so Mr. Kitchen just informed me right quickly that if I expected to do any more business with J.C. Bradford, that I actually had to sign the form, had no choice in that matter.* So here I was in a position where I had talked my father into mortgaging his property with no way of, no means of ever really paying it back off and he's saying that I can not do any business with Mr. Graybeal which I had hoped and believed would be a way of paying the mortgage off, if I did not sign that form. *I had no choice.*"

R. 594–95 (emphasis added).

Plaintiffs testify that, after execution of the release, a number of unauthorized transactions occurred and fraudulent limitations were placed upon their commodities account. Thus, they contend, defendants did not fulfill their representation that they would work with them in good faith to make up the losses. Ultimately, all accounts of the plaintiffs were liquidated to their substantial loss. Plaintiffs also assert that the release is void or voidable because it was executed under duress and that it is thus ineffective to bar their claims.

---

**4.** Phil Street testified:
"Those people are privy to information that the average person is not. And—and they are able to do a lot of things that the average person would not be able to do unless you had a broker working for you."
R. 588.

The trial court granted summary judgment in three orders. The first order upheld the release as a matter of law against plaintiffs' claims of fraud and duress. The second order dismissed plaintiffs' claims that the defendants had conducted unauthorized transactions in plaintiffs' account after the release. The third granted defendants summary judgment on their counterclaim concerning certain balances arising out of the transactions.

## ANALYSIS

### The "New Era" in Summary Judgments

In support of the trial court's decision to grant them summary judgment, the defendants point to three 1986 Supreme Court opinions as effecting a decided change in summary judgment practice: *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Scholars and courts are in agreement that a "new era" in summary judgments dawned by virtue of the Court's opinions in these cases.[5] This court has recognized the dramatic change

brought about by these opinions,[6] as have other courts.[7]

On the whole, these decisions reflect a salutary return to the original purpose of summary judgments. Over the years, decisions requiring denial of summary judgment if there was even a suggestion of an issue of fact had tended to emasculate summary judgment as an effective procedural device.[8]

The first of the recent Supreme Court decisions which changed summary judgment law was *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Liberty Lobby* was a libel action against the columnist Jack Anderson and certain others working with him. 106 S.Ct. at 2508. The defendants had referred to the plaintiff organization and some of its leaders as "Neo–Nazis," anti-Semites, racists and fascists. *Id.* According to the then-existing First Amendment libel doctrine, plaintiffs, as public figures, could not recover unless they could prove by clear and convincing evidence that Anderson had published calculated falsehoods or had written his article with reckless disregard for the truth. *Id.; see New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). After an appropriate time for discovery, the defendants moved for summary judgment on

5. *See, e.g.,* Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183 (1987); Stempel, *A Distorted Mirror: The Supreme Court's View of Summary Judgment, Directed Verdict, and the Adjudication Process,* 49 Ohio St. L.J. 95 (1988); Comment, *Summary Judgment; The Majority View Undergoes A Complete Reversal in the 1986 Supreme Court,* 37 Emory L.J. 171 (Winter 1988).

6. *See, e.g., Emmons v. McLaughlin,* 874 F.2d 351, 355 (6th Cir.1989); *Cloverdale Equip. Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 937 (6th Cir. 1989); *Cincinnati Newspaper Guild v. Cincinnati Enquirer,* 863 F.2d 439, 444 (6th Cir.1988); *Walters v. First Tennessee Bank,* 855 F.2d 267, 272 (6th Cir.1988); *Banks v. Rockwell Int'l North American Aircraft Operations,* 855 F.2d 324, 325 (6th Cir.1988); *Potters Medical Center v. City Hosp. Ass'n,* 800 F.2d 568, 572 (6th Cir.1986).

7. *See, e.g., McGahee v. Propane Gas Co.,* 858 F.2d 1487 (11th Cir.1988); *Donate–Romero v. Colorado,* 856 F.2d 384 (1st Cir.1988); *Dowling v. City of Philadelphia,* 855 F.2d 136 (3d Cir.

1988); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659–60 n. 4 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987); *Slaughter v. Allstate Ins. Co.,* 803 F.2d 857, 860 (5th Cir.1986); *Burchett v. General Tel. Co. of the South,* 699 F.Supp. 114, 116 (E.D.Ky.1988); *Butler Foods, Inc. v. Trailer Marine Transp. Corp.,* 680 F.Supp. 472, 473 (D.P.R. 1988); *American Floral Serv. v. Florists' Transworld Delivery Ass'n,* 633 F.Supp. 201, 227–28 (N.D.Ill.1986).

8. This portion of the opinion is largely derived from an analysis by this writer which appeared in a work on Kentucky practice. *See* W. Bertelsman & K. Philipps, *Kentucky Practice,* Rule 56.03, Comment 11 (1986, 1987, 1988 and 1989 Supp.). The analysis was endorsed by the Kentucky Court of Appeals in *Smith v. Food Concepts, Inc.,* 758 S.W.2d 437 (Ky.App.1988). *See also* Bertelsman, *Views from the Federal Bench,* "Significant Developments in the Law of Summary Judgments," Kentucky Bench & Bar, vol. 51, no. 1 (Winter 1987).

the ground that plaintiffs could not demonstrate that this burden could be met. *Liberty Lobby*, 106 S.Ct. at 2508.

In support of the motion for summary judgment, the defendants had filed an extensive affidavit by one of their author-investigators detailing his sources. *Id.* at 2508–09. In response, the plaintiffs had filed several affidavits asserting that the sources were unreliable and that the publication was untrue and insufficiently supported by an adequate investigation. *Id.* at 2509. Under precedents then prevailing in most courts, probably including this one,[9] summary judgment would have been denied. The record was voluminous and complex, and there were many issues involving the state of mind of the defendants. Indeed, the Court of Appeals for the District of Columbia had reversed the trial court's granting of the summary judgment motion. *Id.*

Nevertheless, the Supreme Court held that the trial court had properly granted summary judgment. *Id.* at 2515. It ruled that not every issue of fact or conflicting inference presents a genuine issue of material fact which requires the denial of a summary judgment motion. Further, the Court held that the materiality of any fact should be determined by the substantive law of the case. *Id.* at 2510. The Court went even further and held that the test for deciding a motion for summary judgment is the same as that for a directed verdict motion. *Id.* at 2512. There is no issue for trial, the Court stated, unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* Thus, the Court concluded, "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

The Court in *Liberty Lobby* also held that, where the nonmoving party must meet a higher burden of proof than usual, that party must meet the same burden in resisting the summary judgment motion. *Id.* at 2512. The Court cautioned that trials on affidavits were not justified and that summary judgments should be granted with circumspection, *id.* at 2513–14, but stated that it was not enough in this case for the plaintiffs to contend that issues concerning "state of mind" were presented. *Id.* at 2514. Nor was it sufficient, the Court stated, to impeach the credibility of the movants' evidence without making a demonstration by credible evidence that the plaintiffs would be able to meet the burden of proof at trial. *Id.*

Instead, the Court held: "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Id.*

The Court's holding in *Liberty Lobby* must be read in connection with its decision in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), decided on the same day as *Liberty Lobby*, to appreciate fully the new tone in summary judgment law imparted by these decisions. *Celotex* was an asbestos products liability wrongful death action. 106 S.Ct. at 2551. After an appropriate period for discovery, the defendant moved for summary judgment, pointing out to the trial court that the plaintiff had been unable to produce any evidence that the decedent had ever been exposed to the defendant's asbestos products. 106 S.Ct. at 2551.

The plaintiff countered that summary judgment should not be granted on the record absent the defendant's showing by at least some of the materials mentioned in Rule 56(e) that the decedent had not been so exposed. *Id.* The trial court granted summary judgment, but was reversed by the Court of Appeals for the District of Columbia. *Id.* The Supreme Court reversed, holding that summary judgment

---

9. *See Smith v. Hudson,* 600 F.2d 60 (6th Cir.), *cert. denied,* 444 U.S. 986, 100 S.Ct. 495, 62      L.Ed.2d 415 (1979).

was proper under the circumstances. *Id.* at 2555.

The Court held that the movant had made a sufficient showing of a lack of a genuine issue of material fact on the crucial issue under consideration by demonstrating that the plaintiff, after an adequate opportunity for discovery, was unable to meet her burden of proof. *Id.* at 2553. The Court rejected the argument, accepted by the Court of Appeals, that the movant's initial showing of lack of a genuine issue of material fact was insufficient because it was not supported by affidavits or other factual materials described in Fed. R.Civ.P. 56. *Id.*

In other words, the movant could challenge the opposing party to "put up or shut up" on a critical issue. After being afforded sufficient time for discovery, as required by Fed.R.Civ.P. 56(f), if the respondent did not "put up," summary judgment was proper. The Court concluded: "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred." *Id.* at 2554.

■ Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion. If, after a sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate.

The third case altering prior summary judgment law was *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *on remand*, 807 F.2d 44 (3d Cir. 1986), which, in harmony with *Liberty Lobby* and *Celotex*, indicated a more favorable regard for summary judgment. In *Matsushita*, the Court held that summary judgment was proper even in a complex antitrust case. 106 S.Ct. at 1361–62. It stated: "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 1356.

The tone of these opinions, even more than their holdings, breathed new life into summary judgment practice. For example, in *Celotex*, the Supreme Court stated:

"The Federal Rules of Civil Procedure have for more than 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact. Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.' Fed.Rule Civ.Proc. 1; see Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issue of Material Fact, 99 F.R.D. 465, 467 (1984). Before the shift to 'notice pleading' accomplished by the Federal Rules, motions to dismiss a complaint or to strike a defense were the principal tools by which factually insufficient claims or defenses could be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources. But with the advent of 'notice pleading,' the motion to dismiss seldom fulfills this function any more, and its place has been taken by the motion for summary judgment. Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis."

106 S.Ct. at 2555.

Further reflection and a review of current court decisions and commentary concerning the effect of the three Supreme Court decisions yields the conclusion that

these three decisions established at least the following principles for "new era" summary judgment practice:

1. Complex cases are not necessarily inappropriate for summary judgment.[10]

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.[11]

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.[12]

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.[13]

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient dis-agreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." [14]

6. As on federal directed verdict motions, the "scintilla rule" applies, *i.e.*, the respondent must adduce more than a scintilla of evidence to overcome the motion.[15]

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.[16]

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." [17]

9. The trial court no longer has the duty to search the entire record to estab-

---

10. *Matsushita, passim. See, e.g., Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 475 (7th Cir.1988) (rejecting argument that summary judgment should not be granted in complex antitrust cases, relying on *Celotex, Anderson,* and *Matsushita* ); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656 (7th Cir.) (summary judgment granted in antitrust action), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987); *Assam Drug Co., Inc. v. Miller Brewing Co., Inc.,* 798 F.2d 311, 317 (8th Cir.1986) (summary judgment appropriate even in complex antitrust litigation); *Berg v. First American Bankshares, Inc.,* 796 F.2d 489 (D.C. Cir.1986) (summary judgment on RICO claims granted in securities and RICO action).

11. *Anderson, passim. See, e.g., Michelson v. Exxon Research & Eng'g Co.,* 808 F.2d 1005, 1008 (3d Cir.1987) (summary judgment granted on retaliatory discharge claim involving state of mind of defendant); *Lichtie v. U.S. Home Corp.,* 655 F.Supp. 1026, 1028 n. 1 (D. Utah 1987) (summary judgment granted in action involving state of mind and motivation of defendant who discharged plaintiff; court found insufficient evidence of self-interest to permit jury consideration).

12. *Celotex,* 106 S.Ct. at 2553; *Cincinnati Newspaper Guild v. Cincinnati Enquirer,* 863 F.2d 439, 443–44 (6th Cir.1988); *Laningham v. United States Navy,* 813 F.2d 1236, 1241 (D.C.Cir.1987); *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133–34 (6th Cir.1986).

13. *Celotex,* 106 S.Ct. at 2554; *Security Ins. Co. of Hartford v. Wilson,* 800 F.2d 232, 233 (10th Cir.1986); *Adamson v. Volkmer,* 680 F.Supp. 1191, 1199 (N.D.Ill.1987).

14. *Liberty Lobby,* 106 S.Ct. at 2512; *McKee v. Cutter Laboratories, Inc.,* 866 F.2d 219, 220 (6th Cir.1989); *Laningham,* 813 F.2d at 1241; *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis,* 799 F.2d 218, 223 (5th Cir.1986); *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 496 (7th Cir.1986); *Kas v. Fin. Gen. Bankshares, Inc.,* 796 F.2d 508, 518 (D.C.Cir.1986); *Berg v. First Am. Bankshares, Inc.,* 796 F.2d 489, 496–97 (D.C.Cir.1986).

15. *Liberty Lobby,* 106 S.Ct. at 2512; *Cloverdale,* 869 F.2d at 937; *Professional Managers,* 799 F.2d at 223.

16. *Liberty Lobby,* 106 S.Ct. at 2510; *Valley Liquors,* 822 F.2d at 659.

17. *Liberty Lobby,* 106 S.Ct. at 2514; *Emmons v. McLaughlin,* 874 F.2d at 355; *Cloverdale Equip. Co.,* 869 F.2d at 937; *Cincinnati Newspaper Guild,* 863 F.2d at 444; *Potters Medical Center v. City Hosp. Ass'n,* 800 F.2d 568, 572 (6th Cir. 1986); *Security Ins. Co. of Hartford,* 800 F.2d at 234; *Kochins,* 799 F.2d at 1134; *Davis v. Robbs,* 794 F.2d 1129, 1130 (6th Cir.), *cert. denied,* 479 U.S. 992, 107 S.Ct. 592, 93 L.Ed.2d 593 (1986); *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243 (2d Cir.1985).

lish that it is bereft of a genuine issue of material fact.[18]

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts."[19] Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted.[20] The trial court has at least some discretion to determine whether the respondent's claim is "implausible."[21]

In the conclusion of his cogent article which appeared in 1987,[22] Steven Childress agreed that the Supreme Court intended to introduce dramatic changes in summary judgment practice. He concluded:

"The recent Supreme Court cases likely require that summary judgment be more readily granted, and at the least they encourage it in certain circumstances. More broadly, the language encounters older dicta making a grant sound impossible and provide ways to argue that quantitative and qualitative review—a real scrutiny of the nonmovant's record—be performed before a denial. This emerging trend signals a new era for summary judgments, one in which the old presumptions are giving way to a policy of balancing and efficiency, and the mechanism is more appropriate to

**18.** *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C.Cir.1988).

**19.** *Matsushita,* 106 S.Ct. at 1356. *See also Cloverdale,* 869 F.2d at 937.

**20.** *Matsushita,* 106 S.Ct. at 1356.

**21.** *Id.* Courts have interpreted the "implausible" language of *Matsushita* cautiously. For example, the Ninth Circuit has held that the trial court may only inquire into the plausibility of circumstantial evidence, and that when the nonmovant presents direct evidence refuting the movant's motion for summary judgment, the court must accept that evidence as true. *McLaughlin v. Liu,* 849 F.2d 1205, 1207 (9th Cir.1988); *T.W. Elect. Serv. Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 631–32 (9th Cir.1987). According to the Ninth Circuit, *"Matsushita* authorizes an inquiry on summary judgment into the "implausibility" of inferences from circumstantial evidence, particularly in antitrust conspiracy cases, not an inquiry into the credibility of direct evidence." *McLaughlin,* 849 F.2d at 1207. *See also California Architectural Bldg. Prod. Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466 (9th Cir.1987) (upholding summary judgment on the grounds there was no direct evidence of fraud), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988); *Richards v. Neilsen Freight Lines,* 810 F.2d 898 (9th Cir.1987) (affirming summary judgment in reliance on *Matsushita* because plaintiff presented no direct evidence of antitrust conspiracy); *Barron v. Safeway Stores, Inc.,* 704 F.Supp. 1555, 1561 (E.D.Wash.1988) (denying summary judgment in employment discrimination case and discussing Ninth Circuit's interpretation of *Matsushita* ).

In *Arnold Pontiac–GMC, Inc. v. Budd Baer, Inc.,* 826 F.2d 1335, 1338 (3d Cir.1987), the Third Circuit reversed the district court's granting of summary judgment and distinguished *Matsushita* because "here plaintiff, unlike the plaintiffs in *Matsushita,* has produced direct evidence of a conspiracy." Similarly, in *Leonard v. Dixie Well Service & Supply, Inc.,* 828 F.2d 291 (5th Cir.1987), the Fifth Circuit reversed the granting of summary judgment which was premised on the district court's conclusion that the movant's evidence was more "credible" than that of the nonmovant. *Id.* at 293. Noting that the *Matsushita* opinion allowed a judge to inquire into the persuasiveness of the evidence of an "implausible" claim, the court held that "[a] judge assessing the 'persuasiveness' of evidence presented on a motion for summary judgment may discount such evidence as unspecific or immaterial, but not as unbelievable." *Id.* at 294.

*Matsushita's* "implausible" language has not, however, been limited to antitrust actions. While some courts have confined the "economic plausibility" analysis to antitrust actions brought under the Robinson–Patman Act or the Sherman Act, *e.g., Key Financial Planning Corp. v. ITT Life Ins. Corp.,* 828 F.2d 635, 638 (10th Cir.1987); *Tunis Bros. Co., Inc. v. Ford Motor Co.,* 823 F.2d 49, 50 (3d Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1013, 98 L.Ed.2d 979 (1988); *Henry v. Chloride,* 809 F.2d 1334, 1335 (8th Cir.1987); *Marsann Co. v. Brammall, Inc.,* 788 F.2d 611, 613 n. 1 (9th Cir.1986), others have utilized it in cases involving securities fraud claims, *In re Fortune Sys. Sec. Litig.,* 680 F.Supp. 1360, 1368 (N.D.Cal.1987); ERISA and state tort law claims, *Holland v. Bank of America,* 673 F.Supp. 1511, 1514 (S.D.Cal.1987); Title VII claims, *Beard v. Whitley Co. REMC,* 840 F.2d 405, 410 (7th Cir.1988); Jones Act claims, *Leonard,* 828 F.2d at 294; FELA claims, *Courtney v. Union Pacific R.R. Co.,* 713 F.Supp. 305, 308–09 (E.D.Ark.1989); and breach of contract claims, *Knight v. Sharif,* 875 F.2d 516, 522 (5th Cir. 1989).

**22.** Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183 (1987).

double as a sufficiency motion—allowing some sort of trial itself on the paper record."

116 F.R.D. at 194.[23]

Nevertheless, even applying the "new era" principles, we conclude that the orders granting summary judgment in this case must be reversed.

### The Release Issue

Having discussed the "new era" summary judgment standards, we must now apply them to the case before us. So applied, they require that the grant of summary judgment by the trial court must be reversed. In fairness, we must observe that the authorities on which we principally rely were cited neither to the trial court nor to us.

■ Federal law controls the validity of a release of a federal cause of action. This precept is ably demonstrated by Judge Shadur's opinion in *Griswold v. E.F. Hutton & Co., Inc.*, 622 F.Supp. 1397 (N.D.Ill.1985).[24]

■ Also as pointed out in *Griswold*, a stock or commodities broker is the agent of the customer and a fiduciary relationship exists between them. Therefore, a release between them is to be evaluated as one obtained by a fiduciary from a beneficiary. 622 F.Supp. at 1406.[25]

■ We hold that the federal common law of release, although largely undeveloped in the cases, at a minimum adopts the standards of the Restatement of Contracts 2d § 173 concerning contracts between parties having a fiduciary relationship. That section states:

"§ 173. When Abuse of a Fiduciary Relation Makes a Contract Voidable.

"If a fiduciary makes a contract with his beneficiary relating to matters within the scope of the fiduciary relation, the contract is voidable by the beneficiary, unless

"(a) it is on fair terms, and

"(b) all parties beneficially interested manifest assent with full understanding of their legal rights and of all relevant facts that the fiduciary knows or should know.

"Comment:

"*a. Equal footing.* The rule stated in this Section applies to any fiduciary, including a trustee, an agent, a guardian, or an executor or administrator. See Restatement, Second, Trusts § 170(2). It is more severe than the rule relating to non-disclosure in the case of one who stands in a relation of trust and confidence but who is not a fiduciary. See § 161(b); cf. § 169(a). When a fiduciary makes a contract with the person beneficially interested, it is not enough that he make a complete disclosure of the facts

---

**23.** This view has been expressly approved in the following authorities: *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 476 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); *Clements v. County of Nassau*, 835 F.2d 1000, 1004 (2d Cir.1987); *Burchett*, 699 F.Supp. at 116; *Santiago v. Lane*, 697 F.Supp. 300, 301 (N.D.Ill.1988); *Nixon v. Celotex Corp.*, 693 F.Supp. 547, 552 (W.D.Mich.1988); *Butler Foods*, 680 F.Supp. at 473; *Soot v. General Elec. Co.*, 681 F.Supp. 157, 162 (S.D.N.Y.1987); *Steptoe v. Beverly Area Planning Ass'n*, 674 F.Supp. 1313, 1318 (N.D.Ill.1987); *Haines v. Quigg*, 673 F.Supp. 314, 318 (N.D.Ind.1987).

**24.** Authorities on which Judge Shadur relied are: *Dice v. Akron, Canton & Youngstown Railroad Co.*, 342 U.S. 811, 72 S.Ct. 59, 96 L.Ed. 613 (1951); *Locafrance U.S. Corp. v. Intermodal Systems Leasing, Inc.*, 558 F.2d 1113 (2d Cir.1977).

**25.** The case at bar is distinguishable from this court's holding in *Runyan v. National Cash Register Corp.*, 787 F.2d 1039 (6th Cir.1986). In *Runyan*, we held that a general release of age discrimination claims signed by a well-educated and experienced employee was not void as a matter of law. *Id.* at 1044. Our decision in *Runyan* was based on our interpretation of the provisions of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 216, 217. In addition, in *Runyan,* the release was executed by "an attorney knowledgeable in labor law and employment discrimination matters." *Id.* at 1044. The court held that "overreaching or exploitation" were not inherent in the circumstances under which the employee signed the release, and that, therefore, "[o]rdinary contract principles would apply." *Id.* at 1045. Ordinary contract principles do not apply in this case, however, because of the nature of the relationship between the parties, that of fiduciary and beneficiary, and because of the inherently exploitative situation in which the plaintiffs were placed when they signed the release at issue.

known to him. *The person beneficially interested must be put on an equal footing with full understanding of his legal rights and of all relevant facts that the fiduciary knows or should know.* If that person is not of competent age and understanding, this may be difficult if not impossible to achieve. If it is impossible, the fiduciary is precluded from making a contract with him within the scope of the fiduciary relation." (Emphasis added).[26]

▪ The Restatement also provides in §§ 175 and 176 that duress exists if a contract is induced by an improper threat. A threat is improper if it is in breach of a duty of good faith and fair dealing such as exists between fiduciaries.[27]

▪ Obviously, Phil Street's testimony regarding the procurement of the release, as quoted above in the statement of facts, if given at trial would provide more than a scintilla of evidence that the federal standards pertaining to releases between persons having a fiduciary relationship were not observed by the defendants in this case. The release is therefore voidable, at least as to the federal causes of action.

If the jury believes this testimony, it might well conclude that no effort was made to put Street on an "equal footing" or fully to advise him of his rights and all possible causes of action available to him. Further, the jury might conclude from this testimony that an improper threat was made, violating the fiduciary relationship. This evidence is not implausible, and Mr. Street's credibility is for the jury. If this is the testimony at trial, a directed verdict could not be granted on the federal causes of action as to the release issue. Therefore, even in the "new era" of summary judgments, summary judgment based on the release was improper on the federal causes of action.

We also rely on *Finn v. Prudential-Bache Securities, Inc.* 821 F.2d 581 (11th Cir.1987), which is closely on point on the facts. There, the evidence was that a broker had wrongfully manipulated his customers' accounts, placing his clients in a desperate financial situation, and that he had then threatened to liquidate their accounts to their ruin, if they did not sign a release. The court held that this burden raised a genuine issue of material fact as to duress. The testimony of the Streets here is closely parallel to that of the plaintiffs in *Finn* [28] as illustrated by the following excerpt:

> "(1) A threat is improper if
>
> \*      \*      \*      \*      \*      \*
>
> "(d) the threat is a breach of the duty of good faith and fair dealing under a contract with the recipient."

*See generally Systems Technology Assoc., Inc. v. United States,* 699 F.2d 1383, 1386–87 (Fed. Cir.1983) (applying 176(1)(d) to claim that settlement agreement between contractor and the United States should be set aside on grounds of economic duress); *David Nassif Assoc. v. United States,* 644 F.2d 4, 12, 226 Ct.Cl. 372 (1981) (discussing economic duress under § 176(1)(d) in breach of contract action); *Goldstein v. S & A Restaurant Corp.,* 622 F.Supp. 139, 144 (D.D.C. 1985) (analyzing claim of duress in signing of agreements in action for breach of contract under "wrongful threat" principles of § 176(1)(d)).

**26.** The courts have applied this section of the Restatement in securities cases involving claims of breach of fiduciary duties between brokers and investors. *E.g., Jarvis v. Dean Witter Reynolds, Inc.,* 614 F.Supp. 1146, 1150 n. 5 (D.Vt. 1985); *Merrill Lynch, Pierce, Fenner & Smith v. Perelle,* 356 Pa.Super. 165, 514 A.2d 552 (1986).

**27.** "§ 175. When Duress by Threat Makes a Contract Voidable.

"(1) If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim."

*See generally Jurgensen v. Fairfax Co., Va.,* 745 F.2d 868, 889–90 (4th Cir.1984) (applying § 175 to claim of duress as defense to employee's signed agreement to demotion); *Morrell v. Stone,* 638 F.Supp. 163, 167 (W.D.Va.1986) (holding that voluntariness of policeman's agreement to resign dependent on elements of duress as defined in § 175); *Reiver v. Murdoch & Walsh, P.A.,* 625 F.Supp. 998, 1013–14 (D.Del. 1985) (discussing § 175(1) in relation to claim of economic duress in employment termination case).

"§ 176. When a Threat is Improper

**28.** The plaintiffs here were not in an adversarial relationship with the defendants, as were the plaintiffs in *Finn,* so the discussion of that opinion as to the right to rely on misrepresentations is inapplicable. Rather, Graybeal was pleading friendship to the Streets. The plaintiffs in *Finn* were also represented by counsel at the time the

"The Finns assert that Bache illegally manipulated their account to the point where the Finns owed over $500,000.00 and that because of that indebtedness, coupled with the Finns' lack of any other meaningful assets, they had no choice but to sign the release in order to have an outside chance of recouping their losses. We find that these allegations raise triable issues of fact as to the claim of duress."

*Finn,* 821 F.2d at 587.[29]

### *Post–Release Transactions*

■ Summary judgment was also improper for the transactions which occurred after the release. Phil and Clyde Street both testified that they agreed to come up with the $150,000 and continue trading only because Mr. Graybeal pleaded with them to do so on the basis of his personal friendship with Phil Street. The Streets' testimony was that Graybeal lamented that he would lose his job if they did not do so and that Graybeal represented to them that he would be able to recoup all of their losses. They testified that they raised the money, rather than relying on their defenses that the orders to sell short were not timely placed, only because of these representations.[30] This testimony, if given at trial, would constitute more than a scintilla of evidence that the Streets were induced to continue trading by misrepresentations of the defendants. Therefore, a directed verdict would be precluded for the post-release transactions as well.[31]

### CONCLUSION

We have gone to some lengths to demonstrate our realization that summary judgment practice has changed in the last three years. We readily acknowledge that the trial court's grant of summary judgment is not improper merely because the record is complex or issues of state of mind are involved.

Here the movants/defendants met their initial burden of pointing out to the court their contention that, ample time having been afforded for discovery, there was a fatal defect in one part of the plaintiffs' case because of the release, and in the other part because any misrepresentations related to "future acts."

We applied the federal directed-verdict standard, as did the trial court. When we looked to the substantive law, however, we determined that it was the federal law of release between fiduciary and beneficiaries that was applicable to the federal causes of action. We determined further that plaintiffs had not, Micawber-like, relied on a forlorn hope that "something would turn up" at trial. Nor were they merely grasping at the straw of possible impeachment of defense testimony, or relying on the now invalidated duty of the trial court to search

---

release was signed. On the duress issue, the *Finn* court relied on state law but we hold that the result would be the same under federal principles.

**29.** In the alternative, we observe that this is also a genuine issue of material fact as to whether the release was fraudulently induced. See discussion of the post-release transactions and authorities in note 30, *infra.* Some of these representations were made at the outset of the relationship between the plaintiffs and defendants. We cannot agree with the trial court that these representations can be shrugged off as "mere puffing." See authorities in note 30, *infra; First National Monetary Corp. v. Weinberger,* 819 F.2d 1334, 1340 (6th Cir.1987).

**30.** Defendants argue that any misrepresentations concerned the performance of "future acts" and could not be the basis of fraud; however, such promises can be the basis of fraud if there is no present intent or ability to perform them. *Apache Trading Corp. v. Toub,* 816 F.2d 605 (11th Cir.1987); *Cauble v. Mabon Nugent & Co.,* 594 F.Supp. 985 (S.D.N.Y.1984). *Cf. Saxe v. E.F. Hutton & Co., Inc.,* 789 F.2d 105, 111–12 (2d Cir.1986); *First National Monetary Corp. v. Weinberger, supra* n. 29.

**31.** Defendants rely in part on the undisputed claim that the form trading contract executed by Phil Street at the onset of his trading activities allowed them to sell him out to protect themselves if he did not meet margin calls. Such contracts have been generally upheld. *Geldermann & Co. v. Lane Processing, Inc.,* 527 F.2d 571 (8th Cir.1975); *Aubin v. H. Hentz & Co.,* 303 F.Supp. 1119 (S.D.Fla.1969). However, the contract would not insulate the defendants if the jury accepts the testimony of the Streets as to the misrepresentations and unauthorized transactions. *See Finn v. Prudential–Bache, supra.*

the record for some "metaphysical doubt" as to a material fact that might be lurking there.

Rather, they had produced more than a scintilla of affirmative evidence of duress under the federal substantive law of fiduciary relations and fraud under the federal securities or commodities law. We found further that plaintiffs' factual theories were not implausible and that a rational trier of fact might resolve the issues raised by defendants' motion in plaintiffs' favor. Therefore, if the same evidence were produced at trial, a directed verdict motion would be denied. So then must the motion for summary judgment.

As to the RICO claims, however, we agree with the trial court that the record reflects no evidence of criminal intent on the part of the defendants, and the summary judgment on the RICO claims should be affirmed.

We have addressed only the federal claims in this opinion. In the lower court no differentiation was made by the parties between federal and state law, and the standards relating to fiduciary releases were inadequately presented to the trial court. Therefore, we will also vacate the summary judgment of the state claims and encourage the trial court to reconsider them in the light of this opinion.

With regard to the summary judgment granted by the district court on defendants' counterclaim, we note that there is no dispute in the record as to the amount owed by plaintiff Phil A. Street to J.C. Bradford & Company. Accordingly, summary judgment was properly entered by the district court on the counterclaim. However, should the plaintiffs prevail upon remand in the court below, then the amount of the counterclaim can, of course, be applied to a setoff.

The summary judgment for defendants is vacated and the case is remanded to the trial court for further proceedings not inconsistent with this opinion.

MILBURN, Circuit Judge, concurring.

Although I concur in the result reached by the majority, I write separately to explain what I view as the genuine issues of material fact presented in this case.

Reduced to the bare essentials, plaintiffs complain about essentially five activities of defendants: (1) fraudulently representing the "limit down" on daily losses in silver futures contracts trading, and fraudulently representing the time within which silver futures contracts could be filled; (2) fraudulently promising to recoup plaintiffs' losses, suffered around February 25, 1983; (3) placing restrictions upon plaintiffs' commodities trading; (4) conducting unauthorized transactions; and (5) liquidating and closing plaintiff Phil Street's commodities account without consent or authorization.

While the district court accurately recognized the nature of plaintiffs' factual allegations, in my view, the court erred by: (1) ignoring the Commodity Exchange Act ("the CEA"), 7 U.S.C. §§ 1–26, and, particularly, section 22 of the Futures Trading Act of 1982, 7 U.S.C. § 25, which provides a private right of action for violations of the CEA; (2) failing to analyze the possible exclusivity of the CEA as regards plaintiffs' claims under federal securities law, *see Point Landing, Inc. v. Omni Capital Int'l, Ltd.,* 795 F.2d 415, 422 (5th Cir.1986) (en banc), *aff'd sub nom, Omni Capital Int'l, Ltd. v. Rudolf Wolff & Company,* 484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987); (3) overlooking the possible preemption of any state law claims in light of the CEA and its 1982 amendments, *compare Kotz v. Bache Halsey Stuart, Inc.,* 685 F.2d 1204, 1207–08 (9th Cir.1982), *with* 7 U.S.C. § 25(b)(5); and (4) neglecting to state the proper standards under the CEA which applied to defendants' conduct in the present case.

The CEA provides extensive protection from a number of activities alleged by the plaintiffs to have occurred in the present case. Specifically, in 7 U.S.C. § 6b, the CEA provides protection for fraud or misrepresentation on the part of commodity futures brokers. *See Clayton Brokerage Co. v. Commodity Futures Trading Comm'n,* 794 F.2d 573, 578 (11th Cir.1986). The general fraud prohibitions cover fraud by any person in connection with a futures transaction on a contract market. *See Horn v. Ray E. Friedman & Co.,* 776 F.2d 777, 780 (8th Cir.1985). As we have held, to establish a claim of fraud, a commodity investor must show that the broker: "[1]

misrepresented a material fact [2] which was intended to induce reliance, [3] that [the investor] reasonably relied on the misrepresentation, and [4] that the reliance was the proximate cause of his damages." *First Nat'l Monetary Corp. v. Weinberger*, 819 F.2d 1334, 1340 (6th Cir.1987). In *Weinberger*, we held that a misrepresentation is material "if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision." *Weinberger*, 819 F.2d at 1340 (quoting *Saxe v. E.F. Hutton & Company*, 789 F.2d 105, 111 (2d Cir.1986)).

Although in the present case the district court found that the alleged representation that plaintiffs could recoup losses was "mere puffing" and that the plaintiffs were thus not entitled to rely upon this representation, in my opinion, plaintiffs have raised a genuine issue of material fact in this regard under the *Weinberger* standard. Furthermore, plaintiffs' testimony regarding defendants' promises about the "limit down" and trading time on silver futures contracts also raises a genuine issue of material fact.

The CEA also prohibits unauthorized transactions on a commodities account. *Haltmier v. Commodity Futures Trading Commission*, 554 F.2d 556, 560 (2d Cir. 1977); *Herman v. T & S Commodities, Inc.*, 578 F.Supp. 601, 603 (S.D.N.Y.1983); *Commodity Futures Trading Commission v. Pyne Commodities Corp.*, 502 F.Supp. 194, 196 (S.D.N.Y.1980), *aff'd*, 681 F.2d 801 (2d Cir.1981). In *Haltmier*, the court held, "[t]here is ... no doubt that it is a violation of the [CEA] for an account executive in the commodity brokerage business intentionally to carry on trading transactions not authorized by his customer." 554 F.2d at 560.

In dismissing Phil Street's claim in this regard, the district court relied upon the Commodities Account Agreement executed by him, finding that the agreement provided defendants with authority to make trades unauthorized by Phil Street. A review of the contract, however, indicates that defendants were permitted to conduct unauthorized transactions only when "necessary for [their] protection." In granting

summary judgment, the district court stated that it was "obvious" that defendants found it necessary to conduct these trades to protect themselves. However, my review of the record discloses that no dispositive evidence was presented that all the alleged unauthorized transactions occurred for defendants' protection. In my view, plaintiffs have raised a genuine issue of material fact in this regard, and thus summary judgment was inappropriate.

Defendants also maintain that any unauthorized transactions were ratified by plaintiffs because Phil Street received monthly reports of J.C. Bradford's trading, yet never protested. Plaintiffs respond that Phil Street protested orally, and that in any event, he never really understood the reports. Given this factual dispute, a jury issue exists as to ratification. *See Hill v. Bache Halsey Stuart Shields Inc.*, 790 F.2d 817, 827 (10th Cir.1986) (upholding a jury's verdict that the investor did not ratify trades even though by contract the investor was required to protest in writing and yet failed to do so).

With these reservations, I concur.