Margaret ZETTLE, Plaintiff,

v.

**HANDY MANUFACTURING COMPANY, Defendant.**

No. 91–CV–10153–BC.

United States District Court, E.D. Michigan, N.D.

Feb. 21, 1992.

Kevin J. Rieman, Patterson, Gruber, Kennedy, Gill & Milster, Bay City, MI, Themistocles L. Majoros, Mossner, Majoros & Alexander, Saginaw, MI, for plaintiff.

Stephanie A. Neal, Neal, Neal & Stewart, Flint, MI, for defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

CLELAND, District Judge.

This products liability action is presently before the Court on defendant's motion for summary judgment. Both parties submitted briefs in support of their respective positions and on January 28, 1992, the Court heard oral argument on defendant's motion. Because the Court finds 1) plaintiff's legal theory that failure to notify of post-sale safety advances is not cognizable under Michigan law, 2) plaintiff has failed to make out a prima facie case of negligent design, and 3) that no reasonable juror could find that defendant's warning was inadequate, defendant's motion will be granted.

### BACKGROUND

This action arises from the tragic death of a young man who was electrocuted while working on a neighbor's farm. At the time of his death, plaintiff's decedent was operating a power washer manufactured by defendant. The power washer was plugged into a "homemade" extension cord provided by the decedent's employer. The extension cord was visibly damaged; slashes in several places along its length exposed bare metal conductors. One stretch of several feet was wrapped with black electrical tape, giving the impression that two cords had been spliced together. In addition, although it appeared

to be a three-conductor "grounded" extension cord, the third, round grounding prong at the male end of the cord had never been connected to the ground wire that ran through the cord itself. The cord was therefore not grounded. While plaintiff's decedent was operating the power washer, the metal junction box at the female end of the extension cord became "energized". Because the ground wire in the cord was not connected to the grounding prong, an electrical current flowed into the grounding prong of the power washer plug and through the grounding wire in the washer's electrical cord, thereby electrifying the cabinet of the power washer. The current may have even traveled through the stream of water in the water hose to the spray gun used to aim and discharge a pressurized stream of water. Plaintiff's decedent, who was operating the washer, died instantly.

After plaintiff's state court action against the decedent's employer was resolved, defendant removed the case to this Court. Plaintiff advances three theories of liability on the part of defendant. First, plaintiff contends that defendant owed a duty to notify users of this washer about post-manufacture safety advances made in connection with its power washers. Second, plaintiff alleges that defendant breached its acknowledged duty of manufacturing a reasonably safe product by failing to incorporate certain safety devices into the power washer. Finally, plaintiff alleges that defendant failed to, adequately warn users of the dangers involved with operating the power washer.

## DISCUSSION AND ANALYSIS

### A. Duty to Notify of Safety Advances

■ Plaintiff acknowledges that product manufacturers have no duty to retrofit their products with safety devices that become available after the date of manufacture. However, plaintiff cites *Comstock v. General Motors Corp.*, 358 Mich. 163, 99 N.W.2d 627 (1959), for the proposition that defendant owed a duty to notify users of its power washers of post-manufacture safety ad-

vances. The Court cannot agree with plaintiff's reading of *Comstock.* First, the Court finds the facts of *Comstock* readily distinguishable from the facts presented here. At issue in *Comstock* was an automobile with defective brakes. The court held that General Motors had a duty to notify users of its products of the defective nature of the brakes. Plaintiff here makes no allegations that defendant's power washer was defective in any way. In fact, for some time after the accident, the owner of the power washer continued to use it on his farm, apparently without incident. Second, as the courts in many other states have recognized, imposing a duty to notify of post-manufacture safety devices would "inhibit manufacturers from developing improved designs that in any way effect the safety of their products, since the manufacturer would then be subject to the onerous, and often times impossible, duty of notifying each owner of the previously sold product that the new design is available for installation...." *Lynch v. McStome and Lincoln Plaza Assoc.*, 378 Pa.Super. 430, 548 A.2d 1276 (1988). Thus, the public interest in encouraging safer product designs clearly counsels against imposing such a duty.

### B. Breach of Duty to Provide Reasonably Safe Product

Plaintiff next alleges that defendant breached its duty of providing a reasonably safe product by failing to incorporate certain safety devices into its power washer. Plaintiff alleges that defendant should have used one of two safety devices: 1) a plastic handle on the spray gun[1] or 2) a cord-mounted ground fault circuit interrupter (GFCI).

■ The Court notes initially that defendant has brought its motion pursuant to Fed. R.Civ.P. 56. Under Rule 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, ad-

---

[1] In its brief, defendant addressed a related theory, failure to use a "double insulated" handle. Plaintiff did not respond either by brief or at oral argument to the defendant's arguments with respect to the double insulated handle, and plaintiff has thus withdrawn this theory.

missions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987), *citing, Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). The existence of a factual dispute does not necessarily defeat a properly supported motion for summary judgment; there must be an issue of material fact in order to necessitate trial.

■ The burden placed upon the movant for summary judgment is to show that the non-moving party has failed to establish an essential element of his case upon which the non-moving party would bear the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). But the moving party need not support its motion with affidavits or other similar materials "negating" the opponent's claim. *Id.* at 323, 106 S.Ct. at 2553. Once the moving party meets this burden, the burden passes to the non-moving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element necessary to his or her case with respect to which he or she bears the burden of proof. *Id.* at 323, 106 S.Ct. at 2553. The non-moving party must show that there is sufficient evidence for a jury to return a verdict in its favor, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989), i.e., that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant. *Id.* at 1476. The non-moving party must present affirmative evidence on critical issues. *Id.* at 1477.

The Michigan Court of Appeals recently summarized the elements of a prima facie case of failure to provide adequate safety devices:

> [A] prima facie case of a design defect premised upon the omission of a safety device requires first a showing of the magnitude of foreseeable risks, including the likelihood of occurrence of the type of accident precipitating the need for the safety device and the severity of the injuries sustainable from such an accident. It secondly requires a showing of alternative safety devices and whether those devices would have been effective as a reasonable means of minimizing the foreseeable risk of danger. This latter showing may entail an evaluation of the alternative design in terms of its additional utility as a safety measure and its trade-offs against the costs and effective use of the product.

*Reeves v. Cincinnati, Inc.*, 176 Mich.App. 181 at 187–8, 439 N.W.2d 326 (1989).

■ Plaintiff points out that of the three power washer models manufactured by defendant in 1980, only the model at issue here, the "Model 1000", incorporated a metal instead of a plastic spray gun handle. Moreover, in the model years immediately following 1980, defendant began to use plastic handles on the Model 1000. These facts constitute evidence that non-metal handles were available, cost-effective, and would not drastically impair the usefulness of the Model 1000. Plaintiff offers the deposition testimony of defendant's experts to show that a plastic handle "would have been effective as a reasonable means of minimizing the foreseeable risk of danger". *Reeves, supra.* Both of defendant's experts agreed that a plastic handle would not conduct electricity. The Court finds that this evidence alone, however, would not allow a reasonable juror to find that a plastic handle would have been effective in minimizing the risk of harm.

Photographs of the power washer and diagrams contained in the instruction manual reveal that the handle is but one of several metal components that make up the spray gun. Most notably, the tubing leading from the handle to the point of discharge (the barrel of the gun) is made of metal. Since nobody witnessed the electrocution, there is no evidence as to which electrified part or parts of the power washer—the cabinet, the spray gun, or otherwise—plaintiff's decedent touched. If it was the spray gun, there is no evidence which would prove that his contact was limited to the handle portion of the gun.

Indeed, the first witness on the scene noted that the spray gun had been handed over to the decedent moments before the tragedy occurred. See Labor Department Accident Investigation Report, attached to defendant's brief as Exhibit C, fourth page ("Bill handed him the wane [sic][2] of the power washer and headed for the garage"). The spray gun appears in the photographs to be fairly large, but not so massive that it could effectively passed from one person to another while both people make contact only with the handle. Further, from the owner's manual, it appears that the spray hose and gun portion of the machine were designed to be hung up and stored on the metal cabinet itself. From all this, there is no evidence to prove, and it is unreasonable even to infer that the decedent held only the handle of the sprayer with one hand and made no contact at any time with the barrel or some other metal portion of the gun or cabinet. In fact, the first witnesses on the scene found the spray gun laying across the decedent's chest. See Exhibit C to defendant's brief, fourth page ("He looked back and seen [sic] the deceased laying on the ground with the wane [sic] across his [the decedent's] chest"). There is furthermore no direct evidence that the spray gun itself was electrified—this concept rests on plaintiff's expert's theory that electric current could travel through the pulsing stream of water being projected down the nonconductive rubber or vinyl hose to the nozzle.

Aside from their relevance to the element of causation, the above facts impact significantly on plaintiff's ability to show alternate design efficacy: that use of a plastic handle would have been an effective means of minimizing the risk of harm. These facts demonstrate clearly that a power washer with a plastic handle would have been safer than the Model 1000 with its metal handle only if individuals using the washer were expected to touch only the plastic handle and carefully avoid every momentary or accidental contact with any other metal part of the spray gun or the washer cabinet. Such an expectation simply is not reasonable in the real world. Accordingly, the Court finds, that on the evidence before it, no reasonable juror could conclude that incorporating one small plastic part in a unit made predominantly of metal would constitute an effective means of minimizing the risk of harm.

■ Plaintiff's theory that the power washer was unreasonably dangerous for failure to incorporate a cord-mounted GFCI fails for a different reason. Along with duty, breach of duty, and damages, plaintiff must prove proximate cause to recover on a theory of negligence. *Moning v. Alfono,* 400 Mich. 425, 254 N.W.2d 759 (1977). Plaintiff here has failed to come forward with any evidence to show that a cord-mounted GFCI would have prevented the electrocution.[3] In simple terms, the path followed by the fatal stream of current to the power washer, through the washer's grounding wire, was completely independent of the circuit that a GFCI would have monitored and protected. Thus, even if the Court assumes that defendant's failure to provide a GFCI constitutes a breach of the standard of care, plaintiff has no evidence to connect the breach with the death of plaintiff's decedent. Plaintiff is therefore unable to carry her burden of proof with respect to proximate cause.

*C. Failure to Provide Adequate Warning*

Plaintiff's final theory of liability is that defendant failed to adequately warn of the risk of harm associated with the operation of its power washer. A reasonably large and visible warning label, which was made of a durable material and affixed to the top of the washer cabinet, read:

STOP

*Read instructions on inside of lid before operating.*

Connect only to <u>grounded</u> 115 volt supply of ample capacity.

---

2. Three pages later in the Labor inspector's handwritten report, he makes reference again to the "wand" of the washer and appears to have gone over the last letter two or three times, more clearly forming a "d" and thus correcting a misspelling.

3. On the other hand, defendant's experts testified that a cord-mounted GFCI would not have prevented the tragedy. *See* deposition of Earl Roberts, pp. 61-5.

Extension cords should be no. 12 <u>grounded</u> wire.

Removal of <u>ground</u> (3rd) <u>prong</u> on plug could cause death.

(capitalization and underlining emphasis in original). The label was in good condition, was positioned by itself on the top of the cabinet, and the message was bordered by a thick dark line broken only by the large word "STOP". Additionally, the first instruction on the inside lid warned: "Never use machine if not properly grounded".

■ In circumstances wherein there exists a duty to warn at all, the appropriate inquiry with respect to a warning alleged to be inadequate is simply whether the manufacturer used reasonable care under the circumstances. *Antcliff v. State Emp. Credit Union*, 414 Mich. 624, 327 N.W.2d 814 (1982). The warning, if required, must be adequate, accurate and effective. *Id.* Beyond the court's initial determination of the legal question of the existence of a duty to warn, a particular warning's accuracy, adequacy and effectiveness are questions which, if supported by competent evidence, are reserved for the jury. *Hill v. Husky Briquetting, Inc.*, 54 Mich.App. 17, 220 N.W.2d 137 (1974). However, if the evidence would not allow a reasonable juror to find that the warning is inadequate, the Court must enter judgment against plaintiff. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir.1989) ("where the record taken as a whole could not lead a rational trier of fact to find for the respondent, the motion [for summary judgment] should be granted").

■ Here, the defendant clearly has assumed a warning responsibility, and the evidence of record (most notably photographs of the power washer) shows that defendant placed the warning label in a highly visible location, atop the power washer cabinet. The word "Stop" appeared in bold capital lettering, obviously designed to attract the attention of potential users. The warning stressed the importance of using only grounded ancillary equipment and warned of the possibility of death. In short, the warning instructed as to how to properly operate

the washer in this respect, and warned of the danger associated with failure to do so.

Plaintiff offers the deposition testimony at pages 122–124 of her witness, William Heilman, offered as an expert, suggesting that it stands as evidence that the warning was unreasonable and inadequate. Here Mr. Heilman opined that defendant's warning transmitted "a misleading message . . . which indicates that there is little to worry about in the operation of this piece of equipment when the opposite is actually true. . . ." (Deposition of William Heilman, pp. 123–4). Although he declined to offer an alternative warning which, in his opinion, would have been adequate ("I didn't plan on designing their warning for them. . . ." Heilman Deposition p. 122), Heilman suggested that the warning should have incorporated the words "danger" and "electrocution hazard". He distinguished between the "low-level" warning word "caution", criticizing it, and the "highest-level" warning word "danger", which he praised although saying at the same time that it "should be used sparingly" (Heilman Deposition, p. 123). No mention appears anywhere in his testimony of the actual wording, STOP, chosen by the defendant. No basis for the opinion is afforded other than his reference to a 1971 publication of the Society of Automotive Engineers.

Plaintiff urges the Court to send to the jury the proposition that this warning was unreasonable solely because of her expert's view that a simple, English language warning which begins with the word "STOP" and ends with the phrase "could cause death", indicates "that there is little to worry about".

No evidence exists on this record to support such a conclusion. The opinion of the witness proffered by plaintiff misses the mark here firstly in its factual predicates. Heilman apparently thought the warning word used was "caution", not "STOP" [4].

Secondly, even if the Court were to annex this witness's opinion to the facts with a broad (and unwarranted) inference that the witness might have actually meant to attack the use of "STOP" instead, the result does

---

**4.** The word "caution" does appear at least at one place in the printed manual of instructions, a

warning which no one suggests is at issue in the decedent's circumstances.

**228**

not change. While it is held up by plaintiff's counsel as a challenge to the warning's adequacy, the testimony does nothing more than quibble without foundation about the difference between the word "STOP" and the word "DANGER". Heilman offers no data—psychological, statistical or other—in support of his expressed belief that "DANGER" would be more effective in communicating a risk of harm. He further claims, without support, that the manufacturer's specific warning of the prospect of "death" was insufficient to raise to the consciousness of an average user that grievous possibility. He does not explain, nor does he present any evidence to suggest why the average power washer user would pay any greater attention to the arcane substitution of some few words for some few others on this cabinet-mounted warning when just such an "average user" in these circumstances, the decedent, had already blithely ignored not only the printed direction to "STOP", but also the clear, indeed dazzling, danger presented by using a chopped-up, cobbled-together and obviously damaged electric cord stretching through the water and mud of the farmyard that day, expecting it to provide the electric current needed for the task at hand.

This witness's opinion, of course, remains an opinion to which he is fully entitled, but, being unsupported by evidence, it legally amounts to nothing more than his personal belief and is simply insufficient to qualify as "affirmative evidence" on the genuine issue of material fact: warning sufficiency. To send this question to the jury for determination on the strength of this testimony would leave the jury groping for guidance, and finding none in the evidence, turning to whim or prejudice.

The Court finds that the evidence of record would not allow a reasonable juror to find the warning inadequate, inaccurate or ineffective. As a matter of law, then, this question as well is resolved in favor of the defendant.

## CONCLUSION

The Court finds that plaintiff's legal theory of failure to notify of post-sale safety advances is not cognizable under Michigan law,

that plaintiff has failed to make out a prima facie case of negligent design, and that no reasonable juror could find that defendant's warning was inadequate. For these reasons, defendant's motion for summary judgment is HEREBY GRANTED.

IT IS SO ORDERED.