935 F.2d 269
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Bill DUTY, d/b/a The Heartland Agency, Plaintiff-Appellant,
v.
Richard L. GOLDEN, Defendant-Appellee.
 No. 90-6321.
 United States Court of Appeals, Sixth Circuit.
 June 18, 1991.
 
 Before RALPH B. GUY JR. and DAVID A. NELSON, Circuit Judges and HIGGINS, District Judge.*
 RALPH B. GUY, Circuit Judge.
 
 
 1
 Plaintiff, Bill Duty, filed this action in which he claimed that the defendant, Richard Golden, reneged on an oral promise to pay him a commission in connection with the sale of a thoroughbred horse. Golden responded by moving for a summary judgment, which the district judge granted.
 
 
 2
 Upon a review of the record, we agree that summary judgment was appropriately granted to the defendant, and we affirm.
 
 I.
 
 3
 Billy Duty is a real estate broker and "bloodstock agent." In 1981, he became acquainted with Joseph Federico who lives in Massachusetts and is involved in thoroughbred racing. Federico was interested in purchasing some land in Kentucky, and Duty showed him farmland that was for sale.
 
 
 4
 In 1984, Federico bought a yearling at Keeneland for what turned out to be a bargain price of $15,000. As a four-year old, the horse, WAQUOIT, came into his own and began doing very well in the races in which he was entered. As a five year old, WAQUOIT won some significant races.
 
 
 5
 Recognizing WAQUOIT's potential as a breeding stallion, Duty, in his capacity as a bloodstock agent, made arrangements with Federico to act as an agent for Federico in a possible sale of the horse. At the same time that Duty was attempting to find a buyer for WAQUOIT, other bloodstock agents also were attempting to sell the horse. In 1987, in a decision he would later regret, Federico turned down an offer of $4,000,000.00 for WAQUOIT.
 
 
 6
 Later in 1987, Duty presented Federico with an offer to purchase on an option basis, which Federico accepted. The sale price was to be $2.7 million. If the sale was completed, Duty was to receive a commission of $100,000 paid by Federico. The option never was exercised. While the option was still open, Duty dealt with another agent in Arizona and presented Federico with an offer of $2.2 million for WAQUOIT, an offer that provided for the buyer to pay a commission of $110,000 to be split between Duty and the Arizona agent. That sale never was completed.
 
 
 7
 Undaunted, Duty then contacted a Chicago agent, Joel Yaffa, and discussed presenting the horse to some of Yaffa's clients. Nothing came of this venture.
 
 
 8
 On July 12, 1988, Duty, by letter, presented WAQUOIT as a desirable stallion prospect to Bud Johnston at Old English Rancho in Ontario, California. His letter indicated that the "owners are flexible, but we are looking at probably $1,500,00.00 to $2,000,000.00 for the horse." By letter dated August 1, 1988, Johnston tendered an offer for WAQUOIT through Duty to Federico, the offer being at $1.2 million for the horse. This offer was rejected by Federico.
 
 
 9
 Up to this point in time, Duty had had no contact with defendant Golden or the group with whom he was associated. The record, made up of documents and depositions, shows conclusively that Golden became involved with Federico and WAQUOIT in the following manner. In July 1988, Windfields Horse Farms announced that it was closing its renowned Maryland breeding farm. A group of Maryland breeders, including Mrs. Richard C. duPont, Bob Levy, Wendy Moon, Dr. Thomas Bowman, and Richard Golden, banded together to try to retain some of the Windfields stallions in Maryland. In pursuit of this venture, Mrs. duPont asked Ben Perkins, a bloodstock agent, if he knew of any new stallion prospects. Perkins suggested WAQUOIT, winner of the Brooklyn Handicap on July 23. Perkins, who had trained horses for Mrs. duPont, agreed to speak to the owner of WAQUOIT and to go to the Boston area to look at WAQUOIT. Perkins called Federico and arranged to go to the Boston area to look at the horse. Perkins advised Federico that he was looking at the horse for Richard Golden, Mrs. duPont, and Robert Levy who were interested in buying the horse. Federico was asking $2.3 million for WAQUOIT at that time.
 
 
 10
 Upon receiving a favorable report from Perkins, the potential purchasers had Dr. Thomas Bowman, a veterinarian and one of the principals, look at WAQUOIT. On August 27, 1988, Bowman, in the company of a trainer, examined WAQUOIT and discussed price and terms of a proposed sale with Federico. Although Bowman's report on WAQUOIT was favorable, the purchase effort did not go forward because Mrs. duPont and Golden were trying to purchase another thoroughbred, JAVA GOLD.
 
 
 11
 The JAVA GOLD purchase fell through, and the duPont/Golden group renewed their negotiations with Federico. Prior to that time, nearly all of the details of a final sales contract had been worked out between Federico and Dr. Bowman, including an agreement to pay Ben Perkins a $30,000 commission, the amount to be paid in equal parts by the seller and buyers. Perkins made another trip to Boston to see Federico on October 3, 1988.
 
 
 12
 We return now to Duty and follow the thread that eventually led him to Golden. During August 1988, Duty renewed his efforts, without success, to effect a sale of WAQUOIT to Old English Rancho. In late September or early October, Duty had a conversation with another bloodstock agent, Rob Whiteley. Duty discussed his unsuccessful efforts to sell WAQUOIT, and Whiteley suggested that he contact Wylie or Amanda Tuttle who were looking for a stallion.
 
 
 13
 On October 5, 1988, Duty called Amanda Tuttle in New York and left a message on her recorder. After not being able to reach Amanda Tuttle, Duty called Wylie Tuttle on October 7, 1988, in the late afternoon. By sheer coincidence, Wylie Tuttle had had lunch with Mrs. duPont earlier that same day and learned of her group's plan to purchase and syndicate WAQUOIT. Against this backdrop, Wylie Tuttle was somewhat surprised to be offered the horse by Duty and even more surprised that the asking price was several hundred thousand dollars less than Mrs. duPont was prepared to pay.
 
 
 14
 Wylie Tuttle did not divulge his conversation with Mrs. duPont to Duty, but since Mrs. duPont was an old friend, Tuttle called her the next day and related his conversation with Duty. Mrs. duPont asked that Tuttle call Golden and tell him about the call from Duty. Tuttle made the call, during which it was clear that Golden had never heard of Duty.
 
 
 15
 After talking with Tuttle, Golden called Duty on October 8, 1988, to investigate further. Golden told Duty he was negotiating to purchase the horse through Ben Perkins and could not understand Duty's offer of sale at a much lower price. Duty told him that he and Federico were long-time friends, and he was confident that Federico would sell WAQUOIT to him (Duty) for the price Duty was quoting. Golden then immediately tried to contact Federico but was unable to do so.
 
 
 16
 After several other conversations over the next two or three days with Duty, Golden concluded that Duty was just trying to insert himself into the sale and that he could not deliver WAQUOIT at the price he was quoting. During this period, Duty sent Golden a draft contract even though Golden had told him not to. The draft contract provided that any commission to be paid would be paid by Federico. On October 22, 1988, the sale of WAQUOIT to the duPont/Golden group was consummated on the terms previously agreed to. Perkins was paid a $30,000 commission.
 
 
 17
 On January 4, 1989, Duty wrote to Golden and demanded payment of a commission. The letter stated:
 
 
 18
 1). You contacted me after talking to Mr. Tuttle and asked to purchase WAQUOIT through my agency because of my lower price. This constitutes an oral agreement.
 
 
 19
 2). The lower price of $2,300,000.00 (for which you subsequently purchased WAQUOIT) as opposed to the asking price of $2,800,000.00 was negotiated by me after spending a week in New York with Mr. Federico at my considerable expense.
 
 
 20
 ....
 
 
 21
 7). Because of efforts on my behalf, you purchased WAQUOIT for $500,000.00 less than you were prepared to pay.
 
 
 22
 (Emphasis in original).
 
 II.
 
 23
 Normally, in an appeal from the granting of a summary judgment, we would not detail the facts to the degree we have here. Obviously, if material facts are genuinely disputed, summary judgment is inappropriate. In this case, however, the summary judgment came after all relevant discovery was completed. Therefore, all the significant testimony was before the trial judge.
 
 
 24
 In his written opinion, the district judge accurately described the thrust of defendant's summary judgment motion:
 
 
 25
 Defendant Golden relies upon two grounds for his motion for summary judgment. First, Golden argues that the testimony of the plaintiff on deposition does not reflect the purported agreement with Golden that Duty claims, but instead reflects an alleged oral agreement under the terms of which the claimed commissions were to be recovered from the seller of the horse, Joseph Federico. Second, Golden argues that all of the credible evidence reflects that the plaintiff had no commission agreement with either Golden or Federico, but attempted to insert himself into an ongoing transaction between the seller and buyer by representing, in the final stages of the negotiations, that he could secure the purchase of WAQUOIT from Federico for approximately $800,000 to $1,000,000 less than the $2.35 million price which had been negotiated between the seller and buyer by other agents representing the parties in the transaction.
 
 
 26
 (App. at 21-22).
 
 
 27
 In resolving the summary judgment motion in favor of the defendant, the district judge concluded:
 
 
 28
 It is apparent from Duty's deposition answers that, taking his claims in the light most favorable to Duty, any claim for a commission on the transaction cannot be due from Golden. Duty claims oral agreements with both Golden (the representative of the buyer) and with Federico (the seller). In short, Duty's testimony reflects an agreement on the part of Golden to pay the purchase price for the horse to Federico and an agreement on the part of Federico to pay the commissions claimed to Duty. Duty, according to his own testimony, did not expect to receive any commissions payment directly from Golden. Therefore, Golden is not properly the contractual party for Duty to look to for his commission.
 
 
 29
 (App. at 22).
 
 
 30
 Although we agree with the trial judge's analysis, we also conclude that defendant's second argument in support of summary judgment was really the stronger of the two arguments.
 
 
 31
 On the basis of the record, no reasonable trier of fact could reach a conclusion other than that which reflects that Duty tried vainly to insert himself into a sales transaction he played no part in setting up. We can understand Duty's sense of frustration since he had put forth considerable time and effort in trying to sell WAQUOIT. In fact, Federico even sent him a $1,000 Christmas present for his efforts sometime during the time period when Duty was trying to find a buyer for the horse. Also, although Perkins received only a $30,000 commission, Duty's expectations were considerably higher, so the prize was worth fighting for.
 
 
 32
 In deciding a summary judgment motion the trial judge does not make credibility determinations, nonetheless, the party opposing the motion has to come forward with at least a plausible theory. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).
 
 
 33
 We discussed the current state of the law on summary judgment in this circuit in Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir.1989). In relevant part we held:
 
 
 34
 5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."
 
 
 35
 6. As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.
 
 
 36
 8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."
 
 
 37
 Id. at 1479.
 
 
 38
 When these standards are applied here, it is clear that summary judgment was appropriate.
 
 
 39
 AFFIRMED.
 
 
 40
 DAVID A. NELSON, Circuit Judge, dissenting.
 
 
 41
 If this case had gone to trial before a jury--as it would have done, presumably, but for the district court's decision to grant defendant Golden's motion for summary judgment--an abundance of evidence would have been presented to show that defendant Golden had never heard of plaintiff Duty until the latter part of the first week in October, 1988; that Golden spoke with Duty for the first time on October 8, 1988, for the sole purpose of investigating Duty's representation to the Tuttles that he could arrange a sale of the horse at a price far below the price that Golden's group was about to commit itself to paying; and that Duty was simply trying to insert himself into a sale that he had not procured and for which he had no legitimate claim to a commission.
 
 
 42
 If the case had gone to trial, however, Duty would have told a very different story. He would have testified that he first spoke with Golden not in October, but in July; that in August of 1988, at Golden's request, he traveled to Saratoga, New York, where he negotiated with Joseph Federico, the owner of the horse, on behalf of Golden; that he made several subsequent calls to both Federico and Golden to iron out the terms of a contract; and that Golden agreed to compensate Duty by the device--common in this business--of including in the purchase contract a provision obligating the seller to pay a stipulated commission. (Without such a provision, one supposes, the buyer could normally expect to get a better price.)
 
 
 43
 Based on what I have read, it seems clear to me that Golden's version of the facts is more likely to prove accurate than Duty's version. I have not heard any live testimony, however, and I cannot say, at this point, that no reasonable juror could accept Duty's version over Golden's. I think that the doubts raised by Duty's sworn statements are more than "metaphysical," see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and unless the defendant is entitled to judgment on some affirmative defense not discussed in the appeal, I would be inclined to give Mr. Duty an opportunity to present his case to a jury.